IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| WILLAMETTE RIVERKEEPER; THE CONSERVATION ANGLER,<br><br>    Plaintiffs,<br><br>v.<br><br>NATIONAL MARINE FISHERIES SERVICE; BARRY THOM, Regional Administrator, Marine Fisheries Service; U.S. ARMY CORPS OF ENGINEERS; MICHAEL HELTON, District Engineer, U.S. Army Corps of Engineers; U.S. FISH AND WILDLIFE SERVICE; ROBYN THORSON, Regional Director, U.S. Fish and Wildlife Service,<br><br>    Defendants,<br><br>OREGON DEPARTMENT OF FISH AND WILDLIFE,<br><br>    Defendant-Intervenor. | Case No. 6:21-cv-00034-AA<br><br>OREGON DEPARTMENT OF FISH AND WILDLIFE'S RESPONSE TO PLAINTIFFS' BRIEF ON REMEDY |

## I.   INTRODUCTION

In January 2025, this Court ruled on the parties' motions for summary judgment. Of a total of 21 errors alleged by the Plaintiffs, this Court identified only 5 areas in which National Marine Fisheries Service's (NMFS's) analysis in the 2019 Biological Opinion (BiOp) was insufficient. Those areas were: (1) failure to consider evidence of degraded habitat below the

Page 1 -  OREGON DEPARTMENT OF FISH AND WILDLIFE'S RESPONSE TO PLAINTIFFS'
          BRIEF ON REMEDY
          DC4/rn1/1008693750

dams on wild winter steelhead eggs, ECF 71 at 30; (2) a need for more investigation into the effect of competition on yearling summer steelhead, *id*. at 46; (3) a need for consideration of displacement of winter steelhead by hatchery summer steelhead, *id*. at 51; (4) a need for consideration of the consequences of worsening climate conditions on winter steelhead, *id*. at 53-54; and (5) analysis of recent data to support a finding that the 2% gene flow cap is or can be met, *id*. at 64. This Court declined to vacate the BiOp at that time, finding that vacatur would be disruptive and would not benefit listed species, particularly given the mitigation measures that are in place and having positive impacts on the listed species. *Id.* at 78. Instead, the Court encouraged the parties to reach a mutually agreeable decision on an appropriate remedy, specifically noting that research being conducted by the Oregon Department of Fish and Wildlife (ODFW) regarding the percent of gene flow could be helpful to achieving a resolution. *Id*.

Now, Plaintiffs seek a permanent injunction prohibiting ODFW from releasing summer steelhead into the North Santiam River until NMFS issues a new BiOp *and* that BiOp has been determined by this court to be lawful. This, they claim, will provide "interim protection for winter steelhead in the relatively cleaner river in the Santiam River basin." Pls' Mem. at 1.

As an initial matter, no relief should be entered against ODFW because Plaintiffs have not asserted or proven any claims against ODFW. Without establishing that ODFW violated the Endangered Species Act (ESA), any relief against it is improper. Moreover, Plaintiffs' request suffers from three other critical defects: (1) Plaintiffs have not established that irreparable harm is likely to occur in the absence of an injunction; (2) Plaintiffs have not established that irreparable harm is likely to occur in the upcoming months between now and when NMFS issues its revised BiOp;[1] and (3) Plaintiffs' requested relief is not narrowly tailored to the harm alleged. Thus, Plaintiffs' request for injunctive relief should be denied.

---

[1] NMFS currently expects to issue the revised BiOp by the end of August. ECF 102 (Declaration of Nancy Munn) at ¶ 9.

Page 2 -   OREGON DEPARTMENT OF FISH AND WILDLIFE'S RESPONSE TO PLAINTIFFS'
            BRIEF ON REMEDY
            DC4/rn1/1008693750

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

ODFW contends that no relief is necessary at this juncture because: (1) NMFS is preparing a revised BiOp that it plans to issue in the near future; (2) ODFW's updated gene flow and competition and displacement analyses indicate that the hatchery summer steelhead program has minimal impact on winter steelhead, thus confirming both the findings in the 2019 BiOp and the success of the adaptive management actions taken by ODFW; and (3) the benefits associated with the hatchery summer steelhead program far outweigh the potential minimal risk associated with the program. ODFW is committed to continuing responsible management of the summer steelhead hatchery program in accordance with the best available current science so that the program continues to pose little, if any, risk to native winter steelhead.

## II.    STANDARD OF REVIEW

An injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). A party seeking a permanent injunction must establish that it has suffered an irreparable injury; that legal remedies such as monetary damages are inadequate, that the balance of hardships favors the plaintiff, and that the public interest will not be disserved by the injunction. *Cottonwood Env't L. Ctr. v. U.S. Forest Serv.,* 789 F.3d 1075, 1088 (9th Cir. 2015) (quoting *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *Cascadia Wildlands v. Scott Timber Co.*, 618 F.Supp.3d 1038, 1067-68 (D. Or. 2022), *aff'd*, 105 F.4th 1144 (9th Cir. 2024). In cases brought under the Endangered Species Act (ESA), the traditional four-factor test has been altered and a presumption that plaintiffs have satisfied the last three elements of the test is applied. *Cottonwood,* 789 F.3d at 1090.

However, a party seeking an injunction must still establish irreparable harm is likely to occur in the absence of an injunction – "there is no presumption of irreparable injury where there has been a procedural violation in ESA cases." *Id.* at 1090-91. Speculative or conjectural harm is not sufficient, nor is a "possibility" or risk of harm. *Cascadia Wildlands v Scott Timber Co.*, 618 F.Supp.3d 1038 (2022). And finally, the injunction requested must be narrowly tailored and

Page 3 -   OREGON DEPARTMENT OF FISH AND WILDLIFE'S RESPONSE TO PLAINTIFFS'
          BRIEF ON REMEDY
          DC4/rn1/1008693750

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

necessary to prevent the irreparable harm caused by the violation of the ESA. *NRDC v. Winter*, 508 F.3d 885, 886 (9th Cir. 2007); *S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, 804 F.Supp.2d 1045, 1053-54 (E.D. Cal. 2011). An injunction "must be no broader and no narrower than necessary to redress the injury shown by the plaintiff." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana,* 98 F.4th 1180 (9th Cir. 2024) (quoting *California v Azar,* 911 F.3d 558, 584 (9th Cir. 2018)). Thus, "the court must decide what irreparable harms are likely to occur to the species in order to craft an appropriately tailored injunction." *S. Yuba River Citizens League*, 804 F.Supp.2d at 1053-54.

### III.    ARGUMENT

Having prevailed on a small portion of their claims against NMFS, Plaintiffs now request that ODFW be enjoined from releasing hatchery summer steelhead into the North Santiam River until NMFS issues a new BiOp that is determined by this Court to be lawful. Pls' Mem. at 1. Ignoring the mismatch between the party against whom they asserted claims (NMFS) and the intervening party against whom they asserted no claims (ODFW), Plaintiffs contend relief against ODFW is necessary to provide "interim protection for winter steelhead in the relatively cleaner river…." *Id*. Plaintiffs' arguments should be rejected for multiple reasons. First, they neither asserted nor proved any claim against ODFW. Second, their arguments are substantively flawed; they reiterate arguments on residualization that are not supported by good science and have already been considered and rejected by the Court, Pls' Mem. at 11-18, extrapolate effects on winter steelhead from those flawed assumptions, and ignore recent analyses by ODFW regarding gene flow and competition and displacement. As discussed below, these recent ODFW analyses are directly responsive to three of the flaws that this Court identified in the 2019 BiOp and support the 2019 BiOp's conclusion of no jeopardy. Plaintiffs cannot establish irreparable harm to winter steelhead is likely to occur if the Court declines to grant their request to cease releases of summer steelhead into the North Santiam River.

Page 4 -    OREGON DEPARTMENT OF FISH AND WILDLIFE'S RESPONSE TO PLAINTIFFS' BRIEF ON REMEDY
DC4/rn1/1008693750

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

### A. Plaintiffs are not entitled to relief against ODFW.

Plaintiffs' Second Amended Complaint contains no allegations against ODFW, states no claims against ODFW, and seeks no relief from ODFW. ECF 46. Instead, Plaintiffs' action is, and always has been, against the federal government – NMFS, the Army Corps of Engineers, and the U.S. Fish and Wildlife Service[2] – and the actions of those federal agencies in issuing the 2019 BiOp and the Environmental Impact Statement and Record of Decision supporting the BiOp. *Id*. Consistent with the scope of the Second Amended Complaint, this Court only evaluated whether *NMFS's* 2019 BiOp satisfied the requirements of the ESA. And the Court only found that *NMFS* erred in some of its analyses.

Despite their (limited) success against NMFS on the 2019 BiOp, Plaintiffs do not seek any relief against NMFS. Instead, they request that the release of fish into the North Santiam River be enjoined. NMFS does not release summer steelhead into the North Santiam River, only ODFW does. If Plaintiffs want relief from ODFW, they must allege claims against ODFW and prevail on those claims. For that reason alone, Plaintiffs' requested relief is inappropriate and should be denied.

### B. Plaintiffs have not satisfied their burden of establishing irreparable harm.

#### 1. Plaintiffs' assertion of harm is speculative and is neither likely nor imminent.

Plaintiffs claim that harm will result to winter steelhead if ODFW releases hatchery summer steelhead into the North Santiam River because "residual summer steelhead are competing with and likely displacing" winter steelhead in the North Santiam. Pls' Mem. at 8. This conclusion is purely conjectural and based on extrapolation from studies that either do not address the Santiam Basin or suffer from fundamental flaws that lead to biased and unreliable results. *See* Declaration of Dr. Elise Kelley at ¶¶ 6-16.

---

[2] Plaintiffs' claims against the Army Corps of Engineers and U.S. Fish & Wildlife Service were dismissed for lack of standing. The only remaining federal defendant is NMFS. ECF 71 at 21, 23.

Page 5 -   OREGON DEPARTMENT OF FISH AND WILDLIFE'S RESPONSE TO PLAINTIFFS' BRIEF ON REMEDY
DC4/rn1/1008693750

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

### a. Plaintiffs rely on unrepresentative and flawed science

In attempting to establish irreparable harm from ODFW's summer steelhead hatchery program, Plaintiffs rely upon a number of studies that occur outside of the Santiam Basin and often outside of Oregon. *Id.* at ¶ 5. While science occurring outside of the Santiam Basin can be useful in informing *directions* for investigation, *conclusions* drawn from studies in other areas cannot necessarily be exclusively relied upon to make management decisions in other areas. *Id.* That is because environmental conditions and other factors have the potential to impact the study; given the complexity of environmental and biological variables across different watersheds, results from a study in one area simply may not hold true in other areas. *Id.* Plaintiffs, however, take conclusions reached in other areas and assume they apply to ODFW's operations and impact in the Santiam Basin. *Id.* at ¶ 11.

Many of the studies cited by the Plaintiffs to support their claim of harm come from outside the Santiam Basin and many do not address summer and winter steelhead interactions. *See id.* at ¶ 5. Plaintiffs heavily rely on a 2015 paper by Harnish et al. that, while addressing summer and winter steelhead in the Santiam Basin, contains a number of assumptions and flaws that limit its applicability. *Id.* at ¶ 6. Moreover, Harnish et al. acknowledge that additional study is needed to conclude whether displacement actually occurs, and admit the data on which their conclusions were based may not be representative. *Id.* at ¶¶ 12, 14-16; Harnish et al. at NOAASUP1604-1605, NOAASUP1607, NOAASUP1609.

ODFW has long questioned the reliability of the conclusions in that study because of the numerous sources of bias introduced by the researchers that would lead to inflated residualization estimates. *See* Kelley Decl. at ¶ 6. Harnish et al. inserted radio tags into hatchery summer steelhead, tracked tagged fish, and snorkeled in the South Santiam River to observe tagged and non-tagged steelhead. Rather than selecting snorkeling sites randomly and in sufficient numbers to avoid biasing the results, Harnish et al. selected their sites based on "what appeared to be quality rearing habitat." *Id.* at ¶ 8; NOAASUP1586. Further sources of bias in the

Page 6 -   OREGON DEPARTMENT OF FISH AND WILDLIFE'S RESPONSE TO PLAINTIFFS'
BRIEF ON REMEDY
DC4/rn1/1008693750

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Harnish et al. study included: the assumption that radio-tagged fish that weren't detected had residualized; determining whether tagged fish were alive by agitating the water to see if the fish moved; and assuming that tagged fish were unaffected by the tagging process and behaving like untagged fish, when that was demonstrably not the case. *Id.* at ¶¶ 9-10. These errors led the researchers to calculate a residualism rate for which they have little evidence and exaggerates the likelihood of impacts from competition and displacement. *Id.* at ¶ 6. If a study does not address these types of bias, broad conclusions about the studied population are unfounded. *Id.* at ¶ 7.

Harnish et al. recognized that the study was flawed and the conclusions less than reliable, stating:

> [W]e recognize there may have been issues with the representativeness of the radio-tagged fish to the general hatchery population. A much larger percentage (17.6%) of radio-tagged fish did not volitionally migrate from the South Santiam Hatchery compared to the general population of hatchery steelhead (~1%). Therefore, it is possible the radio-tagged fish also residualized in the river at a higher rate than the general hatchery population.

*Id.* at ¶ 12; Harnish et al. NOAASUP1607. They also acknowledged that:

> [A] more detailed investigation is needed to determine whether residual hatchery summer steelhead juveniles are in fact displacing naturally produced *O. mykiss* from the highest quality rearing habitat into suboptimal habitats and whether this displacement confers any reduction in the survival of naturally produced *O. mykiss*.

Kelley Decl. at ¶ 15; Harnish et al. NOAASUP1605. Plaintiffs, however, ignore the questionable methods and conclusions from Harnish et al. and apply them to the North Santiam to arrive at percentages and numbers of "residualized" summer steelhead that have little basis in fact. Plaintiffs have not met their burden of establishing that irreparable harm to winter steelhead is likely to occur absent the relief they seek.

### b. Plaintiffs have not established that harm from genetic introgression will occur

Plaintiffs further argue that gene flow from summer steelhead to winter steelhead through interbreeding will result in irreparable harm to winter steelhead. Pls' Mem. at 21. They support

Page 7 -   OREGON DEPARTMENT OF FISH AND WILDLIFE'S RESPONSE TO PLAINTIFFS' BRIEF ON REMEDY
          DC4/rn1/1008693750

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

this argument by claiming that the gene flow rates submitted by ODFW during summary judgment briefing "indicate that interbreeding is occurring," and that "[b]ecause gene flow rates are not 0%, negative genetic effects to winter steelhead are in fact occurring." *Id*. This statement is not correct.[3] First, and as discussed in the Declaration of Dr. Megan Sabal, the island-continent method, which was used in that analysis, takes cumulative hatchery genetic ancestry and estimates the average gene flow per generation. Sabal Decl. at ¶ 13. Because it takes multiple generations to shed genes, gene flow rates will be above 0% even in the absence of current gene flow. *Id.* Plaintiffs cannot establish any likelihood of irreparable harm resulting from current interbreeding of summer and winter steelhead and are not entitled to injunctive relief relating to this assertion.

### 2. Plaintiffs have not established any harm will result during the proposed injunction period

In addition to establishing that irreparable harm is likely to result in the absence of an injunction, the party seeking an injunction must show that the irreparable harm is likely to result during the period the injunction is in place. *S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.,* 804 F.Supp.2d 1045, 1057 (E.D. Cal. 2011) (declining to order interim relief "that will provide no benefit to the listed species in the interim period."). Plaintiffs have not even attempted to do so, relying on generalized assertions with no temporal connection to the requested injunction. The reason for this is simple – they cannot establish that any irreparable harm will occur in the handful of months between now and when NMFS plans on issuing its revised BiOp at the end of August. ECF 102 (Declaration of Nancy Munn) at ¶ 9. And once the revised BiOp is issued, it constitutes a new agency action and is presumed valid unless and until it is determined to be invalid. Thus, any injunction issued by this Court would be dissolved and

---

[3] Plaintiffs' citation to ECF 61-1 in support of that statement is also incorrect. ECF 61-1 is the 2024 gene flow analysis performed by Dr. Sabal. Nowhere does it state or imply that the estimates "indicate that interbreeding is occurring."

Page 8 -   OREGON DEPARTMENT OF FISH AND WILDLIFE'S RESPONSE TO PLAINTIFFS'
            BRIEF ON REMEDY
DC4/rn1/1008693750

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

ODFW would be protected from claims of "take" under Section 9 of the ESA as long as it complies with the terms and conditions of the revised BiOp.

Because Plaintiffs have failed to establish irreparable harm is likely to result at all, much less in the next few months before NMFS issues its revised BiOp, Plaintiffs' request for injunctive relief should be denied.

### 3. Plaintiffs' requested relief is not narrowly tailored

Finally, injunctive relief must be narrowly tailored and necessary to prevent the irreparable harm alleged to result from the violation. *NRDC v. Winter*, 508 F.3d 885, 886 (9th Cir. 2007); *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana,* 98 F.4th 1180 (9th Cir. 2024). Again, Plaintiffs have made no attempt to establish a nexus between how ceasing releases of summer steelhead in the North Santiam but not the South Santiam will prevent the genetic introgression, competition, or displacement they allege. Plaintiffs do not argue that the alleged irreparable harm only results from releases into the North Santiam. Instead, it appears that the requested injunctive relief is tied to advancing other objectives of the Plaintiff, and not remedying an alleged irreparable harm. Because Plaintiffs have not established that its requested injunctive relief is narrowly tailored or necessary to prevent the alleged irreparable harm, their request should be denied.

### C. Recent analyses in the Santiam Basin show minimal impacts from hatchery summer steelhead on wild winter steelhead.

Plaintiffs' claims of irreparable harm are based on questionable, outdated science, much of which does not even address the Santiam Basin, but more recent analyses conducted within the Santiam Basin and specifically designed to estimate the effects of the summer steelhead hatchery program show that the program has minimal adverse impacts on winter steelhead. Declaration of Thomas Stahl at ¶ 10; Sabal Decl. at ¶ 28. As this Court is aware, ODFW has taken many actions over the years to mitigate adverse effects from the hatchery program, including reducing the numbers of fish released, shifting the timing of hatchery summer

Page 9 -   OREGON DEPARTMENT OF FISH AND WILDLIFE'S RESPONSE TO PLAINTIFFS' BRIEF ON REMEDY
DC4/rn1/1008693750

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

steelhead spawning earlier to reduce potential overlap with winter steelhead, and suspending recycling of adult summer steelhead. ECF 71 (Opinion and Order) at 63-70; ECF 60 (Declaration of Ryan Couture). Recent analyses show that these management efforts, in conjunction with the removal of hatchery smolts that do not migrate of their own volition, appear successful and there is little impact from summer steelhead on winter steelhead. Stahl Decl. at ¶ 9-10.

1. **ODFW's gene flow analysis demonstrates gene flow below 2%.**

In their motion for summary judgment, Plaintiffs argued that the 2% gene flow standard set forth in the BiOp has not and cannot be met, pointing to studies by Johnson et al. (2013) and (2018) and Weigel et al. (2018) to conclude that "a significant portion of the DPS is genetically compromised." ECF 49 at 26. The Court reviewed the methods used by NMFS to estimate the gene flow rate and found that either the Scott-Gill or the island-continent method are acceptable approaches for estimating gene flow, and that NMFS could base its conclusions on either. ECF 71 at 59. The Court questioned, however, whether the data used, which spanned the years 1986 – 2011, was recent enough to conclude what the *current* gene flow is. ECF 71 at 63 ("there is a high level of uncertainty about what the current gene flow rate *is,* and that the data, on the whole, does not support the BiOp's approval of the HGMP.")

In March 2024, ODFW analyzed the estimated gene flow from hatchery summer steelhead to winter steelhead using the island-continental method set forth in the 2019 BiOp and ultimately approved by the Court as best available approach. Sabal Decl. at ¶ 3, Ex. 1, Willamette River Steelhead: Steelhead Genetics and Gene Flow Analysis, 2018-2022;[4] ECF 71 at 59 (either the Scott-Gill method or island-continent method constitute the best scientific and commercial data). This method was chosen because it uses genetic data directly and is likely to be conservative (*i.e.*, estimated gene flow is likely higher than what actually occurs). Sabal Decl.

---

[4] This paper was previously provided as an attachment to the Declaration of Shaun Clements (ECF 61-1),but was not considered by the Court because it was extra-record evidence. ECF 71 at 24. For ease of reference, the same document is attached to the Declaration of Megan Sabal and filed herewith.

Page 10 -   OREGON DEPARTMENT OF FISH AND WILDLIFE'S RESPONSE TO PLAINTIFFS' BRIEF ON REMEDY
DC4/rn1/1008693750

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

at ¶ 10. Using data from 2022 – the most recent data available – Dr. Sabal estimated the amount of genetic mixing from hatchery summer steelhead into wild winter steelhead. *Id*. at ¶ 9.

The results of Dr. Sabal's analysis estimated recent gene flow rates of 1.22% in the North Santiam and 0.55% in the South Santiam for 2022 – lower than the 2% allowed by the 2019 BiOp. *Id*. at ¶ 10. When compared to fish sampled in 2018, island-continent gene flow estimates were lower across all basins, indicating that the adaptive management measures implemented by ODFW appear to be successful in reducing spawner overlap and gene flow. *Id*. at ¶ 12; Stahl Decl. at ¶¶ 9-10. The recent analysis confirms that the less than 2% gene flow limit can and is being attained.

### 2. Recent analyses show competition and displacement is near zero

In response to the Court's determination that the 2019 BiOp did not adequately address the effects of competition and displacement on winter steelhead, ODFW performed a stock-recruitment analysis and a population viability analysis to determine whether competition or displacement had a population-level effect on adult winter steelhead returns. Sabal Decl. at ¶ 14; Ex. 2 . These analyses show that the average effects of competition and displacement by hatchery summer steelhead on winter steelhead are near zero. *Id*. at ¶¶ 16, 19. These analyses have been provided to NMFS. *Id* at ¶ 6.

As described in the declaration of Dr. Sabal, to perform the stock-recruitment analysis, a statistical model was built that examined whether the number of hatchery summer steelhead released was correlated with adult winter steelhead returns. *Id*. at ¶ 15. The number of hatchery summer steelhead released was a proxy for lower to higher competition and displacement. *Id*. The model incorporated hatchery and environmental covariates such as estimates of winter steelhead spawners and recruits, hatchery releases, stream temperature, two regional ocean indices, and an upwelling index. *Id.* at ¶ 17. Using data covering brood years 1990-2017 (calendar years: 1990-2023), the longest dataset available, ODFW's stock-recruitment analysis found average hatchery effects "near zero" for both North and South Santiam basins (0.022 and -

Page 11 -   OREGON DEPARTMENT OF FISH AND WILDLIFE'S RESPONSE TO PLAINTIFFS'
            BRIEF ON REMEDY
DC4/rn1/1008693750

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

0.010 respectively). *Id*. at ¶¶ 16-17.[5] To evaluate the robustness of the results, years and environmental covariates were varied in the dataset and hatchery effects were estimated again. *Id*. at ¶ 21. Hatchery effects were consistently near zero. *Id*. Instead, recent past variability in adult winter steelhead returns was driven by other environmental drivers – for example the effect of a marine index (NPGO) was 24-times higher than estimated hatchery effects. *Id.*

ODFW also conducted a population viability analysis to project wild winter steelhead returns over 100 years. *Id*. at ¶ 25. Population dynamics were simulated 5000 times using different parameters such as habitat capacity and intrinsic productivity to provide uncertainty. *Id*. at ¶ 26. Hatchery effects were inherently considered, along with other environmental drivers, in the projected population variability. *Id*. This analysis showed a less than 9% chance that the North or South Santiam winter steelhead populations would be extinct in the next 100 years, even if historical conditions including hatchery operations continue. *Id*.at 27.

The analyses of the impacts of gene flow and competition and displacement are the most current and reliable estimates of the impacts of hatchery summer steelhead on winter steelhead. These results are consistent with the efforts that ODFW has taken over the years to protect winter steelhead while providing the benefits associated with the summer steelhead hatchery program. Stahl Decl. at ¶¶ 9-10. Not only have Plaintiffs failed to present evidence to establish that irreparable harm to winter steelhead will result in the absence of their requested injunctive relief, they cannot do so because the science tells us otherwise.

### D.    No Additional Relief is Necessary

ODFW believes that no further relief in this case is necessary. When procedural violations of the ESA are found, the typical remedy is remand, with or without vacatur. *Center for Food Safety v. Regan,* 56 F.4th 648, 663 (9th Cir. 2022) (invalid agency action left in place

---

[5] Plaintiffs attempt to discount these results because data estimating winter steelhead abundance prior to the beginning of the summer steelhead hatchery program in the 1960s does not exist. Pls' Mem. at 16. As explained in Dr. Sabal's declaration, it is possible to evaluate potential competition or displacement without pre-hatchery data. Sabal Decl. at ¶¶ 22-24.

Page 12 -   OREGON DEPARTMENT OF FISH AND WILDLIFE'S RESPONSE TO PLAINTIFFS' BRIEF ON REMEDY
DC4/rn1/1008693750

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

"when equity demands") (cleaned up); *Nat'l Wildlife Federation v. Nat'l Marine Fisheries Serv.*, 839 F.Supp.2d 1117, 1128 (citing *Fla. Power Light v. Lorion,* 470 U.S. 729, 744 (1985)). The Court has already determined that vacatur of the 2019 BiOp was not appropriate because of the disruptive consequences that would result and the lack of benefit from vacatur; that determination applies equally now. ECF 71 at 78.

And as discussed above, additional relief would serve no purpose. NMFS is in the process of preparing a revised BiOp to correct the errors identified by the Court and expects to issue it in a matter of months. Moreover, recent analyses conducted by ODFW confirm that the summer steelhead hatchery program is not currently adversely affecting winter steelhead and also confirm the conclusions in the 2019 BiOp that led to the no jeopardy conclusion. ODFW has demonstrated that its management of the hatchery program is safe and effective, and ODFW is committed to continuing responsible hatchery management into the future based on the best available science and the requirements of NMFS. Stahl Decl. at ¶¶ 10-11.

Finally, the hatchery summer steelhead program provides significant benefits to the State, its residents, and visitors that extend well beyond the Santiam Basin. In addition to recreational benefits to anglers, the summer steelhead program provides economic benefits to businesses that support angling activities, such as marinas, restaurants, and sporting goods stores. Kelley Decl. at ¶¶ 18-20. ODFW is regularly approached by angling groups that strongly support the summer steelhead fishery. *Id*. at ¶ 19. Moreover, adult hatchery summer steelhead are donated for food and other beneficial purposes. *Id.* at 19. From 2021 to 2025, over 7,000 adult summer steelhead were collected at Minto Fish Facility (North Santiam), and nearly 6,000 of those fish (over 30,000 lbs) were donated to the Oregon Food Bank, local Gleaners, and Tribes for food. *Id*. Adult hatchery summer steelhead are also used for educational purposes and stream enrichment. *Id*. These benefits would cease if ODFW was ordered to stop releasing hatchery summer steelhead into the Santiam basin.

Page 13 -   OREGON DEPARTMENT OF FISH AND WILDLIFE'S RESPONSE TO PLAINTIFFS' BRIEF ON REMEDY
DC4/rn1/1008693750

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

## IV. CONCLUSION

Plaintiffs' request to enjoin ODFW from releasing hatchery summer steelhead into the North Santiam River should be denied. Plaintiffs neither asserted nor prevailed on any claim against ODFW. Moreover, Plaintiffs have failed to demonstrate that any irreparable harm is likely to result in the absence of an injunction; Plaintiffs have failed to demonstrate that any irreparable harm is likely to result in upcoming months before NMFS issues its revised BiOp; and Plaintiffs' requested relief is not narrowly tailored to any irreparable harm.

Because the updated analyses performed by ODFW demonstrate that there are little, if any, current effects of the hatchery program on naturally produced winter steelhead in the Santiam Basin, NMFS and ODFW have or are in the process of remedying the limited deficiencies identified by the Court, and a revised BiOp is expected in the near term, ODFW believes that no further relief is necessary.

DATED March  13 , 2026.

Respectfully submitted,

DAN RAYFIELD
Attorney General

    *s/ Deanna Chang*
DEANNA CHANG #192202
Senior Assistant Attorney General
Trial Attorney
Tel (971) 673-1880
Fax (971) 673-5000
Deanna.J.Chang@doj.oregon.gov
Of Attorneys for Defendant-Intervenor ODFW

Page 14 -  OREGON DEPARTMENT OF FISH AND WILDLIFE'S RESPONSE TO PLAINTIFFS' BRIEF ON REMEDY
    DC4/rn1/1008693750

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000