Peter M. K. Frost (OSB #911843)
Western Environmental Law Center
120 Shelton McMurphey Blvd., Suite 340
Eugene, Oregon 97401
Tel: 541-359-3238
frost@westernlaw.org

Lindsey Hutchison (OSB #214690)
Willamette Riverkeeper
1210 Center Street
Oregon City, Oregon 97045
Tel: 503-223-6418
lindsey@willametteriverkeeper.org

Robert Kirschner Jr. (OSB #074399)
Crag Law Center
3141 East Burnside St.
Portland, Oregon 97214
Tel: 503-894-0439
rob@crag.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| WILLAMETTE RIVERKEEPER et al., | Case No. 6:21-cv-34-AA |
| Plaintiffs, | **PLAINTIFFS' REPLY TO DEFENDANTS' AND DEFENDANT-INTERVENOR'S OPPOSITION TO MOTION FOR RELIEF** |
| vs. | |
| NAT'L MARINE FISHERIES SERVICE et al., | |
| Defendants, | |
| and | |
| OREGON DEP'T OF FISH AND WILDLIFE, | |
| Defendant-Intervenor. | |

Plaintiffs' Reply to Ds' and DIs' Opposition to Plaintiffs' Motion for Relief, Case No. 6-21-cv-34-AA

Table of Contents.

Table of Authorities.................................................................................................................ii

Summary of Reply...................................................................................................................1

Argument.................................................................................................................................2

A.      The Court Can Enjoin ODFW's Releases....................................................................2

B.      NMFS and ODFW Fail to Disprove the Likelihood of Irreparable Harm.........................3

        1.  NMFS Did Not Submit Any Scientific Data on Irreparable Harm..............................3

        2.  The Court Owes ODFW No Deference....................................................................4

        3.  ODFW Fails to Submit Any Data as to Residualization...........................................4

        4.  Harnish is Best Available Scientific Data that ODFW Fails to Discredit....................5

        5.  Riverkeeper Proves Reasonable Residualization in the North Santiam......................6

        6.  ODFW Does Not Dispute Competition and Displacement Are Present.......................6

                    a.  ODFW's Competition and Displacement Analysis is Flawed..............7

                    b.  The SRA Has Seven Major Flaws.............................................7

                    c.  The PVA Has Three Major Flaws.............................................9

        7.  ODFW's Gene Flow Analysis Has Five Major Flaws..............................................10

C.      Riverkeeper's Requested Relief is Narrowly Tailored...................................................10

D.      The Evidence Does Not Show Expedient Work on a Forthcoming BiOp............................11

E.      NMFS's Vacatur-or-Nothing Approach is Invalid.........................................................12

F.      Riverkeeper's Request that this Court Maintain Jurisdiction on Remand.........................12

Conclusion..............................................................................................................................12

Table of Authorities.

Cases:

*Cal. Chamber of Com. v. Council for Educ. Rsch. On Toxics*,
    29 F.4th 468 (9th Cir. 2022) ...................................................................................2

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
    2026 WL 898264 No. 4:24-cv-04651-JST (N.D. Cal. March 30, 2026) .........................11

*Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*,
    789 F.3d 1075 (9th Cir. 2015) ............................................................................1, 15

*Hoopa Valley Tribe v. Nat'l Marine Fisheries Serv.*,
    230 F. Supp. 3d 1106 (N.D. Cal. 2017).....................................................................7

*San Luis Obisbo Coastkeeper v. Cnty. of San Luis Obisbo*,
    161 F.4th 590 (9th Cir. 2025)...............................................................................11

*Schneider v. Dumbarton, Inc.*,
    762 F.2d 129 (D.C. Cir. 1985)................................................................................2

*Sierra Forest Legacy v. Sherman.*,
    646 F.3d 1161 (9th Cir. 2011) ...............................................................................4

*Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs*,
    486 F.3d 638 (9th Cir. 2007) .................................................................................3

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
    422 F.3d 782 (9th Cir. 2005) .................................................................................1

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
    886 F.3d 803 (9th Cir. 2018) .............................................................. 1, 7, 10, 11

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
    839 F. Supp. 2d 1117 (D. Or. 2011).......................................................................12

*Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs*,
    558 F. Supp. 3d 1056 (D. Or. 2021)).......................................................................4

*U.S. v. Or.*,
    657 F.2d 1009 (9th Cir. 1981) ...............................................................................2

*Wishtoyo Found. v. United Water Conserv. Dist.*,
    2018 U.S. Dist. LEXIS 174505 (C.D. Cal. 2018) .........................................................7

Miscellaneous:

Fed. R. Civ. P. 24(a)(2) .................................................................................................................2

Pursuant to the Court's Order of January 29, 2026 (ECF No. 95), Plaintiffs Willamette Riverkeeper et al. ("Riverkeeper") hereby respectfully file this reply to the opposition of Defendants National Marine Fisheries Service et al. ("NMFS") and Defendant-Intervenor Oregon Department of Fish and Wildlife ("ODFW") to Riverkeeper's request for relief.

Summary of Reply.

The Ninth Circuit has held that under the ESA, the factors to get an injunction to protect an ESA-listed species collapse into the issue of a reasonable likelihood of irreparable harm to the species. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 793-94 (9th Cir. 2005). It has also held that "[t]he ESA accomplishes its purposes in incremental steps, which includes protecting the remaining members of the species . . . . Harm to those members is irreparable." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 818-19 (9th Cir. 2018). Finally, it has held that it "should not be onerous" to prove irreparable harm to a listed species. *Cottonwood Env't L. Ctr. v U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015).

Here, NMFS and ODFW do not appear to dispute native winter steelhead in the Upper Willamette River basin are at "moderate-to-high risk [of extinction], with a declining viability trend." Plfs' Ex. 28 at 186. Nor that their high risk status is based on overestimated abundance, and that the run in one of the four rivers that comprise the DPS (the Calapooia) is likely to go extinct. McMillan Decl. ¶¶ 41-42; Plfs' Exs. 28 at 189, 29; NOAA AR 2038. Nor that habitat for the remnant run in the Molalla is characterized by high erosion, destabilized streambanks, and turbid water. NOAA SUP AR 658-59. Nor that in its request for relief, Riverkeeper acquiesces to continued releases of summer steelhead into the South Santiam, so broodstock can be collected at the South Santiam Hatchery for releases into that river and indeed outside of the DPS, where most summer steelhead fishing occurs. Finally, the opposing parties do not seriously dispute that in the North Santiam, winter steelhead face competition, displacement, and genetic harm from non-native summer steelhead; they contest the *quantum* of these harms, but not that they exist.

By contrast, neither NMFS or ODFW assert any irreparable harm at all to oppose Riverkeeper's request that ODFW no longer put into the North Santiam non-native summer steelhead that historically never existed, that are put there solely for recreational fishing, and that comprise only 7% of summer steelhead fishery in the Upper Willamette River basin as a whole. McMillan Decl. ¶¶ 52-54; Plfs' Exs. 36 at 4, 37 at 4, 38 at 4, 39 at 4, 40 at 8-9; USACE AR 792. Riverkeeper's request for relief is a modest ask given the context of (1) the healthiest river of the four that comprise the DPS, (2) prospects for winter steelhead recovery in the DPS, and (3) the very minor impact on recreational fishing for summer steelhead in the Upper Willamette River.

Argument.

NMFS and ODFW fail to submit evidence that overcome Riverkeepers' showing that releasing summer steelhead into the North Santiam cause a reasonable likelihood of irreparable harm to winter steelhead. Riverkeeper narrowly tailors its requested relief to those releases, which this Court may enjoin because ODFW intervened. NMFS's stated (but not proven) intent to issue a BiOp, subject to funding, does not avoid the continued likelihood of irreparable harm.

A.    <u>The Court Can Enjoin ODFW's Releases.</u>

At the outset, ODFW opposes Riverkeeper's request by arguing that since the Court ruled the BiOp is (in respects) unlawful, no claim has been brought against it, and it is not subject to an injunction. ODFW Opp. at 5. However, by filing a motion to intervene in this case as of right, upon the Court's grant of its motion, ODFW became a party, subject to being bound by court orders (including injunctions); that is the benefit/price of intervention. *U.S. v. Or.*, 657 F.2d 1009, 1014 (9th Cir. 1981) ("Intervenors under Fed. R. Civ. P. 24(a)(2) … enter the suit with status of original parties and are fully bound by all future court orders."); *Cal. Chamber of Commerce v. Council for Educ. Rsch. On Toxics*, 29 F.4th 468, 483 (9th Cir. 2022) ("[t]his includes the duty to be bound by the district court's injunction order."); *Schneider v. Dumbarton, Inc.*, 762 F.2d 129, 132 (D.C. Cir. 1985) ("The price of … intervention … is the possibility that the plaintiff will be able to obtain relief against the intervenor-defendant even if the original

defendant is eliminated from the lawsuit."). Thus, ODFW is incorrect that it was necessary for Riverkeeper to amend its complaint to assert claims against it, and convert ODFW into a defendant, to enjoin its releases of summer steelhead. *Cf.* ODFW Opp. at 5.[1]

B.    NMFS and ODFW Fail to Disprove the Likelihood of Irreparable Harm.

Riverkeeper surpasses its evidentiary burden with data and declarations from an undisputed expert on the likely effects of hatchery steelhead on wild steelhead in the North Santiam. McMillan Decl.; Second McMillan Decl. (filed herewith), Plfs' Exs. 1-35, Plfs' Exs. 41-46 (filed herewith). The evidence shows releasing summer steelhead into the North Santiam causes a reasonable likelihood of irreparable harm to winter steelhead in the river.

1.    NMFS Did Not Submit Any Scientific Data on Irreparable Harm.

NMFS does not submit evidence on irreparable harm despite its allegedly expedient work on a new BiOp, which should have produced by now any such any evidence. NMFS Opp. at 3 (asserting diligence). Likewise, if ODFW's analyses yield such data, NMFS would cite them, but it does not. NMFS Opp.; ODFW Opp. Exs. 1-2. In fact, NMFS now concedes that "[r]eleases of large numbers of … summer steelhead may temporarily exceed rearing capacities and displace winter juvenile steelhead" in the Santiam Basin as a whole.[2] Second McMillan Decl. ¶ 25; Plfs'

---

[1] NMFS incorrectly asserts Riverkeeper delayed in seeking relief. NMFS Opp. at 15-6. Riverkeeper requested relief in their pleadings and conducted discovery to support that request. Complaint at 12; Amended Complaint at 12; Second Amended Complaint at 12. Riverkeeper sought vacatur on summary judgment because that is the "normal remedy" for procedural violations. Plfs' Mot. for Sum. Judg. at 39-40 (quoting *Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs*, 486 F.3d 638, 654 (9th Cir. 2007)). The Court denied vacatur and recommended remedy negotiations. Order of Jan. 21, 2025, at 78-9. Riverkeeper followed that recommendation by seeking the assistance of Magistrate Judge Mark D. Clarke. After settlement negotiations failed, Riverkeeper filed its remedy brief. These actions demonstrate Riverkeeper's good faith effort and respect for judicial economy, not any delay.

[2] Previously, NMFS contended that "[t]he actual fish densities in [the South Santiam] are not known, but likely to be less than habitat carrying capacity." NOAA AR 2179.

Ex. 46 at 3. (excerpt from Federal Columbia River Power System BiOp (2020)). Therefore, as to NMFS's opposition, Riverkeeper surpasses its evidentiary burden to obtain the relief it requests.[3]

### 2.    The Court Owes ODFW No Deference.

ODFW also opposes Riverkeeper's request, but it deserves no deference as to its assertions as to the propriety of relief. *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1186 (9th Cir. 2011) (district court abused its discretion by deferring to an agency on equitable prerequisites for an injunction.). ODFW is not the ESA expert consulting agency, and its views partially rest on an invalid BiOp. *Id.* ("Deference to agency experts is particularly inappropriate when their conclusions rest on a foundation tainted by procedural error."). For example, ODFW's asserts there is no genetic harm, but that assertion rests on its alleged compliance with the 2% gene flow limit, which the BiOp shows cannot be measured with certainty. *Cf.* ODFW Opp. at 11; Opinion and Order at 64 (ECF No. 71) ("it is entirely unclear whether the 2% gene flow cap is or can be attained or measured.").

### 3.    ODFW Fails to Submit Any Data as to Residualization.

ODFW does not submit any data on residual summer steelhead in the Santiam River Basin, nor the North Santiam specifically, which it should possess if it manages summer steelhead releases to protect winter steelhead. Its approved Hatchery and Genetic Management Plan (HGMP) sets a recommended performance target of <10% residualization which, if ODFW complied with that numeric target, it should have data to prove it has done so. Second McMillan Decl. ¶ 10; USACE AR 6589. But ODFW provides no such data, so it falls back on generally asserting it responsibly manages fish in the North Santiam. *Cf.* Stahl Decl. ¶ 10 (asserting that the summer steelhead program provides a "responsible" fishery).

/ / /

---

[3]  In a related case, a U.S. Army Corps of Engineers biologist assigned to the Willamette Valley Project declared "summer steelhead … have been *known* to displace juvenile UWR steelhead in the North or South Santiam river sub-basins." Second Declaration of Richard Piaskowsk ¶ 117 (emphasis added), ECF No. 134, *Northwest Envtl. Defense Center et al. v. U.S. Army Corps of Eng'rs et al.*, 558 F. Supp. 3d 1056 (D. Or. 2021).

4.      <u>Harnish is Best Available Scientific Data that ODFW Fails to Discredit.</u>

As far as Riverkeeper can tell from ODFW's opposition, it has not replicated Harnish in the winter steelhead DPS, nor relies on any other published observation-based data on summer steelhead residualization in the Santiam Basin (*e.g.*, tag or snorkel data). Nevertheless, to oppose Riverkeeper's request for relief, ODFW asserts Harnish and his co-authors from the Pacific Northwest National Laboratory published biased results. ODFW Opp. at 6.

First, Harnish saw "large numbers" of residual untagged summer steelhead during snorkel surveys, which indicates that tagged summer steelhead that exited the hatchery behaved like other summer steelhead (i.e., both types residualized in high numbers). McMillan Decl. at ¶ 15b; NOAA AR SUP 1608. Had tagging caused high residualization instead of the hatchery environment, Harnish would have seen fewer residual untagged summer steelhead. McMillan Decl. at ¶ 15b. ODFW ignores Harnish's observation, and provides no observation-based data of its own to rebut it (assuming they exist). Second McMillan Decl. ¶¶ 3, 10. Therefore, the evidence shows that it is more likely that summer steelhead residualize at high rates in the Santiam River Basin (e.g., at least 12.8%). McMillan Decl. ¶¶ 11, 13-14.

Second, Harnish saw more summer steelhead in good habitat near the hatchery and more winter steelhead in bad habitat away from the hatchery, which demonstrates displacement. *Id.* at ¶ 34; NOAA AR SUP 1560. ODFW does not explain this trend, nor offer displacement data (assuming they exist) to rebut it. Kelley Decl. ¶¶ 15-16; Second McMillan Decl. ¶ 9. Instead of explaining that trend, ODFW asserts that Harnish's observations are biased because Harnish snorkeled in steelhead habitat rather than in randomly selected areas, which is unsupported. Kelley Decl. ¶ 8; Second McMillan Decl. ¶ 4. The current best available science shows that it is reasonably likely that summer steelhead displace winter steelhead in the North Santiam.

Third, ODFW elides that Harnish in fact corrected for potential bias by removing the 17.6% of tagged fish that did not exit the hatchery. McMillan Decl. ¶ 15a; Second McMillan Decl. ¶ 2. And ODFW fails to provide evidence that tagged steelhead exit hatcheries and die at

higher rates (as ODFW asserts may happen, but provides no proof it does), or describe ODFW's protocol for reducing tag bias (assuming it exists). *Id.* ¶ 3; Kelley Decl. ¶ 7. In sum, Harnish corrected for bias, and produced reliable data on summer steelhead residualization.

Fourth, ODFW submits tag studies on species other than steelhead that Riverkeeper cites. Kelley Decl. ¶ 7; ODFW Exs. 3-4; Second McMillan Decl. ¶ 2. These studies are not probative of the situation on the North Santiam: ODFW fails to explain its reliance on a carp study from Illinois, or an Atlantic salmon study from Vermont, when it asserts it cannot rely on out-of-basin studies to manage summer steelhead. *See* Second McMillan Decl. at ¶ 2; Kelley Decl. ¶ 5.

5.    Riverkeeper Proves Reasonable Residualization in the North Santiam.

ODFW is incorrect that Riverkeeper's summer steelhead residualization estimates for the North Santiam are not "scientifically defensible." Kelley Decl. ¶¶ 11, 13; Second McMillan Decl. ¶¶ 6-7. First, ODFW ignores that Riverkeeper applied residualization rates that NMFS and ODFW themselves use (i.e., <10% or 5.6%, respectively). McMillan Decl. ¶¶ 20-21. Second, Riverkeeper explains that applying the 12.8% residualization rate to the North Santiam is complex because mixed hatchery rearing may cause lower or higher residualization rates. *Id.* ¶ 18. Third, ODFW does not explain why it is allegedly "unscientific" to cite the 0%-17% residualization range in Hausch & Melnychuk (2012), which is the same study ODFW cites to support its claim that a 5.6% rate is more accurate. ODFW Resp. to Plfs' Mot. Sum. Judg. at 17 (ECF No. 59); Second McMillan Decl. ¶ 7. Fourth, ODFW does not provide any evidence of alternative rates to prove Riverkeeper's estimates are wrong. Riverkeeper applies fair and data-based, best available science estimates to the North Santiam, which ODFW fails to rebut.

6.    ODFW Does Not Dispute Competition and Displacement Are Present.

ODFW fails to submit data to dispute that all competition and displacement factors occur in the North Santiam (=overlap in time, overlap in space, large hatchery fish, and large releases). McMillan Decl. ¶¶ 22-30. Instead, ODFW criticizes Harnish and submits competition and displacement analyses, which fail.

a.    ODFW's Competition and Displacement Analysis is Flawed.

ODFW's competition and displacement analysis is unreliable. *See* ODFW Exs. 1-2. It includes a Stock Recruitment Analysis (SRA) and a Population Viability Analysis (PVA). ODFW Ex. 2. NMFS did not use either method in the BiOp to analyze competition or displacement. Sabal Decl. ¶ 14. Regardless, these analyses fail.

b.    The SRA Has Seven Major Flaws.

First, the BiOp estimates that harm from competition and predation by hatchery fish (summer steelhead and spring Chinook) is equivalent to losing 1,130 juvenile winter steelhead in the UWR basin, including in the North Santiam River. NOAR AR 2178. The SRA does not show these effects on winter steelhead do not occur. Therefore, it does not disprove irreparable harm to winter steelhead. *Cf. Hoopa Valley Tribe v. Nat'l Marine Fisheries Serv.*, 230 F. Supp. 3d 1106, 1137 (N.D. Cal. 2017) ("Evidence that the Coho salmon will suffer imminent harm of *any* magnitude is sufficient to warrant injunctive relief.") (emphasis added)). Because the BiOp itself shows that irreparable harm is reasonably likely to occur, Riverkeeper's relief should be granted.

Second, the SRA uses a 10% decline in recruits as the benchmark for measuring "substantially negative" effects without explaining how winter steelhead can withstand any decline when recovery requires more recruits. Sabal Decl. ¶ 20; *cf.* McMillan Decl. ¶ 48 (explaining that recovery requires population growth); Second McMillan Decl. ¶ 23. Therefore, the SRA does not disprove irreparable harm. *Wishtoyo Found. v. United Water Conserv. Dist.*, 2018 U.S. Dist. LEXIS 174505*,* 206 (C.D. Cal. 2018) (impeding recovery of endangered steelhead population is irreparable harm) (citing *National Wildlife*, 886 F.3d at 818-19).

Third, the SRA model produced flawed results. Specifically, it estimates that Skamania summer steelhead have a relative reproductive success (RRS) rate of 95%-100%, which is starkly inconsistent with the scientific literature. Second McMillan Decl. ¶ 14. For example, Kostow et al. (2003) found that Skamania summer steelhead in the nearby Clackamas River have a RRS rate of only 4%-13%. *Id*; NOAA AR 10658; Plfs' Ex. 45 at 8 (finding that Skamania

summer steelhead produce 28% as many smolts as wild fish). The SRA model's failure to produce plausible RRS estimates indicates that the model is searching for a mathematical solution, not the one that necessarily matches biological reality. Second McMillan Decl. ¶ 14. Because the model does not fit biological reality, all of its results are unreliable. *Id*. Therefore, ODFW's findings based on that flawed model are also unreliable. *Id.*

Fourth, ODFW is not transparent about age-class data. Sufficient age class data are important because, without them, it is difficult to tell if hatchery releases affected a cohort of smolts. *Id*. ¶ 16. Peer-reviewed science specifies the age-class data it uses. *Id*. (providing examples of peer reviewed literature that does so). Here, ODFW asserts it used age-class data from genetic samples, but it does not identify when or where they were collected. *Id.* This is concerning, because to Riverkeepers' knowledge, there are no published studies that use large sample sizes of age-class data from the Santiam River basin. *Id.* Because ODFW's description of its age class data is vague, and since there does not appear to be sufficient, published data on these age classes to reliably detect effects of hatchery releases on cohorts of smolts, scientists would view the SRA skeptically; and so, too, should this Court.

Fifth, ODFW's assertion that post-1990 data shows that the onset of the summer steelhead program did not cause winter steelhead productivity to decline earlier is not credible. *Id.* at ¶ 22. Without analyzing earlier data – including data ODFW possesses but does not use here (1976-1990 data) – it is scientifically impossible for ODFW to reach that conclusion. *Id.*

Sixth, ODFW purports that one year of no hatchery releases is a proxy for pre-hatchery release data, but nothing in the peer-reviewed scientific literature supports that proposition. Sabal Decl. ¶ 23; Second McMillan Decl. ¶ 21. ODFW also contends that its study is like Scheuerell et al. (2020), which lacked pre-hatchery release data and involved several years when no hatchery steelhead were released. Sabal Decl. ¶ 23. But Scheuerell also had 39 years of age-class data and higher variability in hatchery release sizes (e.g., up to 600,000 released), which produced more

reliable results. Second McMillan Decl. ¶ 18. Therefore, ODFW's study is not as rigorous or transparent as Scheuerell.

Seventh, no party disputes that ocean conditions significantly affect steelhead productivity. However, the fact that ODFW found that environmental conditions allegedly have 24 times greater impact than summer steelhead releases does not prove those releases cause no additional harm to winter steelhead. *Cf.* Sabal Decl. ¶ 24. ODFW's comparative effects analysis is irrelevant.

        c.      The PVA Has Three Major Flaws.

First, the PVA does not predict extinction risk within 100 years because it does not factor in climate change. Second McMillan Decl. ¶ 11; NOAA AR 8399 (explaining that the PVA model "is not intended to capture effects of global warming, human population growth, or other anticipated future change."). Winter steelhead are highly vulnerable to climate change, which will increase stream temperatures throughout their life stages. McMillan Decl. ¶ 47, Exs. 27 at 28, 32 at 6; Second McMillan Decl. ¶ 11; Ex. 41 at 17. ODFW cannot predict future extinction risk if it does not consider the future.[4] Therefore, the PVA does not predict extinction risk.

Second, the PVA masks extinction risk to native winter steelhead, which are the "genetic legacy" of the species. Second McMillan Decl. ¶ 12; NOAA AR 4257. Specifically, the PVA does not discount non-native winter steelhead, which represent one-third of winter steelhead crossing Willamette Falls. McMillan Decl. ¶ 42; Plfs' Ex. 29; Second McMillan Decl. ¶ 12. By combining native and non-native winter steelhead counts, the risks to the Santiam populations appear lower, when, in fact, they are higher because their proverbial genetic foundations are crumbling. *See* McMillan Decl. ¶ 50; Plfs' Ex. 33 at 14 (showing that only 8% of steelhead in North Santiam are pure, native winter steelhead); Second McMillan Decl. ¶ 12.

---

[4]  NMFS asserts it considers climate change when determining the risk status of UWR steelhead. Plfs' Ex. 27 at 62, 65.

Third, the PVA incorrectly describes extinction risk levels for Santiam Basin winter steelhead. ODFW claims that a 9% risk of extinction in 100 years is a "low" risk, but the best scientific data available show that is a "moderate" risk. Sabal Decl. ¶ 15; Second McMillan Decl. ¶ 13; Plfs' Ex. 42 at 2. Regardless, NMFS rates UWR steelhead at "moderate-to-high" risk of extinction with declining viability, which ODFW does not dispute. McMillan Decl. ¶ 40; Plfs' Exs. 27 at 19, 28 at 189.

### 7. ODFW's Gene Flow Analysis Has Five Major Flaws.

ODFW's gene flow analysis is unreliable for five reasons. First, it appears to have been developed and conducted by non-geneticists, which undermine its credibility because performing genetic analyses requires specialized training and education. Second McMillan Decl. ¶ 29. Second, it does not appear that NMFS provided written concurrence on the analysis, as the BiOp requires, and, therefore, it is uncertain whether NMFS officially approved ODFW's study. *Id.* ¶ 28; NOAA AR 2207. Third, it does not resolve whether winter steelhead can withstand any current or legacy-related gene flow on top of climate change. Second McMillan Decl. ¶ 27. Fourth, it does not explain why ODFW conducted genetic sampling in a "subset" of previously surveyed areas, which should be explained to ensure against bias (e.g., running a random selection model, which produces sampling options, and then choosing those options that are less occupied by summer steelhead). *Id.* ¶ 30. Fifth, it does not prove that adaptive management is effective because below average summer steelhead returns likely caused or contributed to allegedly lower gene flow rates. *Id.* ¶ 31.

### C. Riverkeeper's Requested Relief is Narrowly Tailored.

To obtain relief under the ESA Riverkeeper must: (1) show a sufficient causal connection between the alleged irreparable harm and the activity to be enjoined; and (2) narrowly tailor the relief to the irreparable harm. *National Wildlife*, 886 F.3d 823 (after finding a BiOp to be unlawful in part, finding a sufficient casual connection between dams harming ESA-listed fish, and ordering spill at dams to protect them). Riverkeeper does so here, because it proves: (1) a

reasonable likelihood of irreparable harm to winter steelhead in the North Santiam from summer steelhead releases; and (2) narrowly tailors relief as to summer steelhead releases in that river.

NMFS asserts relief must be narrowly tailored to irreparable harm stemming from faulty analyses, not activities that cause that harm. NMFS Opp. at 15. That is incorrect; if that were the standard, the only available relief would be vacatur or remand of BiOps, as only activities subject to consultation cause irreparable harm, not analytical errors. Fortunately for ESA-listed species that need protection during remand, NMFS's assertion is not the standard. *National Wildlife*, 886 F.3d 803 (explaining standard).

Relatedly, because the balance of harm always tips in favor of listed species. *Cottonwood*, 789 F.3d at 1091, the Court cannot weigh ODFW's assertions about the economic or recreational benefits of the summer steelhead fishery in the Upper Willamette Basin. *San Luis Obisbo Coastkeeper v. County of San Luis Obisbo*, 161 F.4th 590, 600-01 (9th Cir. 2025) (in the context of relief under the ESA, "[w]e reject the County's position that this holding resurrects all the usual equities—economic, developmental, or otherwise.").

D.    <u>The Evidence Does Not Show Expedient Work on a Forthcoming BiOp.</u>

NMFS asserts it scheduled a meeting with its attorney eight months after this Court issued its Opinion; received ODFW's competition and displacement analysis nine months after the same; and waited for case developments, which do not affect its duty to prepare a new BiOp. Munn Decl. ¶¶ 6-7; NMFS Opp. Exs. 1-2. NMFS also admits any new BiOp is "subject to constraints on agency resources." NMFS Opp. at 3. Regardless, district courts grant relief under the ESA when a reasonable likelihood of harm to a species is shown, even when a defending federal agency asserts a new final agency action is forthcoming. *See*, *e.g.*, *Ctr. for Biological Diversity v. U.S. Dep't of Interior*,  2026 WL 898264, at *24-25 & n.9, No. 4:24-cv-04651-JST (N.D. Cal. March 30, 2026) (vacating agency ESA regulations even though agency asserted new ones were forthcoming shortly and would moot case).

/ / /

E.       NMFS's Vacatur-or-Nothing Approach is Invalid.

NMFS faults Riverkeeper for not repeating its vacatur request, which the Court denied. ECF No. 71 at 78-9. Nothing requires Riverkeeper to waste judicial resources on already denied relief; its focus is on narrowly-tailored injunctive relief, which it proves is appropriate here.

F.       Riverkeeper's Request that this Court Maintain Jurisdiction on Remand.

To clarify, Riverkeeper respectfully requests that this Court maintain jurisdiction over this case, not to review the next BiOp. *Cf. National Wildlife,* 839 F. Supp. 2d 1117, 1130 (D. Or. 2011) (maintaining jurisdiction to ensure compliance with an order). Retaining jurisdiction would ensure NMFS issues a BiOp and enable Riverkeeper to file a supplemental and/or amended complaint from this Court, which is familiar with the issues.

Conclusion.

Riverkeeper surpasses its non-onerous evidentiary burden. The evidence shows that: critical native winter steelhead are severely depleted; all competition and displacement factors occur in the North Santiam; residual summer steelhead outcompete and displace winter steelhead and likely number in the thousands in the North Santiam; and gene flow continues. NMFS does not challenge the data, and ODFW's analyses do not disprove what the data show: releasing summer steelhead cause a reasonable likelihood irreparable harm to winter steelhead. Riverkeeper's narrow request seeks to protect the population with the best chance of survival, allows ODFW to continue operating the South Santiam Hatchery, and would only reduce recreational summer steelhead catch by approximately 7%. Riverkeeper respectfully requests that this Court grant this equitable and practical relief.

Date: April 10, 2026.                    Respectfully submitted,

                                         /s/ Robert Kirschner Jr.
                                         Robert Kirschner Jr. (OSB #074399)
                                         Peter M. K. Frost (OSB #911843)
                                         Lindsey Hutchison (OSB #214690)

                                         Attorneys for Plaintiffs