IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

WILLAMETTE RIVERKEEPER;
CONSERVATION ANGLER,

Plaintiffs,

v.

NATIONAL MARINE FISHERIES
SERVICE,

Defendant,

and

OREGON DEPARTMENT OF FISH
AND WILDLIFE,

Defendant-Intervenor.

Civ. No. 6:21-cv-00034-AA

**OPINION & ORDER**

---

AIKEN, District Judge:

Before the Court is Plaintiffs Willamette Riverkeeper's and Conservation Angler's Motion for Interim Injunctive relief, ECF No. 96, against Defendant National Marine Fisheries Service ("NMFS") and Defendant-Intervenor, Oregon Department of Fish and Wildlife ("ODFW"), (collectively "Defendants"). For the reasons that follow, the Motion, ECF No. 96, is GRANTED.

## BACKGROUND

On January 8, 2021, Plaintiffs filed this action against Defendants for alleged violations of the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq*.; National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*.; and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706. *See* Second Am. Compl., ECF No. 46. Plaintiffs contend that ODFW's release of non-native hatchery-raised summer steelhead into the North and South Santiam Rivers, designated habitat of the ESA-listed winter steelhead, jeopardizes the continued existence of the winter steelhead. On January 21, 2025, the Court determined that NMFS's 2019 Biological Opinion ("BiOp"), which determined that the hatchery release of summer steelhead into the North and South Santiam Rivers would not jeopardize the winter steelhead, was invalid. The Court remanded the BiOp without vacatur. Plaintiffs now seek to enjoin further summer steelhead releases into the North Santiam River.

I. *Flood Control Act and Willamette Valley Project Dams*

In 1950, Congress enacted the Flood Control Act of 1950, 81st Cong., 2d Sess., Pub. L. 516, 64 Stat. 163 (May 17, 1950), which authorized the building of dams, reservoirs and related projects in the Upper Willamette River Basin ("UWR"). The Project is known as the Willamette Valley Project ("WVP"). The Project included the building of 13 dams, including dams on the North and South Santiam Rivers. *Id.*; *see also* NOAA AR 2319 (2008 BiOp). The dams block winter steelhead from roughly one-third of its historic spawning and rearing grounds. NOAA AR 2809 (same).

Under the Flood Control Act and authorizing WVP documents, the U.S. Army Corps of Engineers ("USACE") must mitigate losses caused by the WVP dams to "the

present [anadromous] fish population" in the UWR, including in the North and South Santiam Rivers. U.S. Army Corps of Engineers, Portland District, Review Report on Columbia River and Tributaries, App. J: Willamette River Basin, H.R. Doc. No. 81-531, at 1866 (Oct. 1, 1948); *see also* NOAA AR 2286 (2008 BiOp) ("The Flood Control Act of 1950 references a USACE report, HD 531, that recognizes the huge runs of anadromous fish in the Willamette River system *before* the project dams were built. HD 531 states that the dams will adversely affect anadromous fish, and that mitigation is needed. The USACE stated in the report that until passage is feasible, hatcheries are mitigation that should be used for these dams['] effects on blocking passage for anadromous fish." (emphasis added)).

On the North Santiam River, the Marion Forks Hatchery and Minto Fish Facility are located downstream of Detroit Dam and Big Cliff dam, which block upstream habitat. NOAA AR 2320 (2008 BiOp). On the South Santiam River, the South Santiam Hatchery and the Foster Dam Fish Facility are located downstream of Foster Dam, which blocks upstream habitat. *Id.* The hatcheries and fish facilities are components of ODFW's program to mitigate harm to pre-dam anadromous fish populations, including the winter steelhead. NOAA AR 2319 (2008 BiOp).

The dams on the North and South Santiam Rivers confine winter steelhead below much of their historic spawning and rearing habitat. NOAA AR 13925 (2015 Status Review). And habitat conditions below the dams are "poor." NOAA AR 2054 (2019 BiOp). Water quality in the downstream rivers and tributaries is degraded due to dams, discharge of pollutants, riparian disturbance, and lack of riparian canopy

cover and vegetation. NOAA AR 14381–82 (2019 FEIS). The waters are classified as Clean Water Act 303(d) "water quality impaired" due to, among other things, high temperature and low dissolved oxygen, which are harmful to winter steelhead. NOAA AR 14379–82 (same). Further, riparian areas along the rivers and tributaries lack trees to create shade, and adjacent lands exhibit "poor agricultural and forestry practices." NOAA AR 14379–80 (same). In 2015, NMFS found that "[m]uch of the accessible habitat . . . in the North and South Santiam Rivers is degraded and under continued development pressure." NOAA SUP 1569 (Harnish et al. 2015). However, because winter steelhead are blocked from higher quality habitat above the dams, the waters just downstream of the dams near the hatcheries and fish facilities are the "highest quality" spawning and rearing habitat that winter steelhead can reach. *Id.*

II. *Summer Steelhead Hatchery Program*

In 1966, ODFW began releasing summer steelhead into the UWR solely for the purpose of recreational fishing. USACE AR 792, 799. Summer steelhead are non-native, not endangered, and have no conservation benefit. USACE AR 4455 ("Summer steelhead are not native to the Upper Willamette Basin."); *see also* NOAA AR 2035 (2019 BiOp) (ODFW took the summer steelhead it chose to release into the UWR from non-native stock from the Skamania Hatchery on the Washougal River in Washington). The creation of a summer steelhead run "was intended to expand the duration of the steelhead angling season through the summer and fall and, in fact, that has happened." USACE AR 792.

III. *ESA Winter Steelhead Listing*

On March 25, 1999, NMFS listed two UWR winter steelhead populations as threatened under the ESA and designated the populations "evolutionarily significant units" ("ESUs"). 64 Fed. Reg. 14517 (March 25, 1999).

In 2006, NMFS listed or re-listed under the ESA ten "distinct population segments" ("DPSs") of West Coast steelhead, including four independent UWR winter steelhead population segments. 71 Fed. Reg. 834, 860 (Jan. 5, 2006).

The UWR ESA-listed population segments occupy four UWR subbasins: the North Santiam, South Santiam, Molalla, and Calapooia River basins. NOAA AR 2030 (2019 BiOp map). Each of these river basins has its own distinct population of winter steelhead. *Id.* Among the four populations, most (70%) winter steelhead return to the Santiam River basin. NOAA AR 10954 (Mapes et al. 2017). Each of the Santiam populations are both "core" and "genetic legacy" populations. NOAA AR 4257 (2018 HGMP).[1] "McElhany et al. (2003) recommended that core and legacy populations be given priority in recovery planning because these populations may have the intrinsic capacity to sustain large populations into the future and they retain the most intact representation of the genetic character of the ESU." *Id.* ODFW does not release summer steelhead into the Molalla or Calapooia Rivers. NOAA AR 2130 (2019 BiOp).

[1] A "core" population "historically represented substantial portions of the DPS's abundance or contained life-histories specific to the DPS." NOAA AR 4257 (2018 HGMP). And a "genetic legacy" population "is a population having minimal hatchery influence or exhibiting important life-history characteristics no longer found throughout the [evolutionarily significant unit]." NOAA AR 4259 (same).

IV. *Summer Steelhead Hatchery Reform Measures*

In 2007, the USACE and other federal agencies consulted with NMFS as to the effects of ODFW's summer steelhead releases on UWR winter steelhead populations. A 2008 BiOp determined that the releases jeopardize the continued existence of the UWR winter steelhead populations. NOAA AR 2238–3508 (2008 BiOp). NMFS proposed a reasonable and prudent alternative to avoid jeopardy. NOAA AR 3187 (same). That alternative provides for the implementation of a Hatchery and Genetic Management Plan ("HGMP") to reform ODFW's summer steelhead hatchery program. NOAA AR 3253–3255 (same).

In June 2018, ODFW submitted to NMFS a proposed summer steelhead HGMP with reform measures to better protect the UWR winter steelhead populations. NOAA AR 4247 (2018 HGMP). The reform measures include (1) reducing summer steelhead releases to 121,000 in each of the North and South Santiam River; (2) stopping the "recycling" of unfished summer steelhead; and (3) training summer steelhead to spawn in December and January to avoid overlap with the later winter steelhead spawning time. NOAA AR 4269–70 (same).

V. *2019 Biological Opinion*

On May 17, 2019, NMFS issued a BiOp that evaluated the effects of summer steelhead releases into the Santiam Rivers under the HGMP on the UWR winter steelhead populations. NOAA AR 1990–2237 (2019 BiOp). The BiOp concluded that the releases would not jeopardize the winter steelhead provided that ODFW comply with the HGMP reforms *and* keep the gene flow rate under 2%. NOAA AR 2207 (same) ("If these [reform] actions do not limit gene flow from summer steelhead to

ESA-listed winter steelhead populations to less than 2%, . . . further reductions in the release of hatchery summer steelhead in these rivers shall be implemented."). NMFS also prepared an Incidental Take Statement ("ITS") to address incidental take[2] of winter steelhead from any adverse genetic and ecological hatchery fish impacts. NOAA AR 2201 (2019 ITS).

On January 21, 2025, the Court issued an Opinion, in which it determined that the 2019 BiOp was invalid. Order & Opinion ("Op."), ECF No. 71. The Court determined that the BiOp, as reviewed under the APA's arbitrary and capricious standard, was invalid because (1) the BiOp failed to consider the effects of degraded UWR habitat on winter steelhead eggs, *id.* at 29; (2) the BiOp's conclusion that hatchery steelhead have "low" competition effects on winter steelhead was not supported by the evidence, *id.* at 46; (3) the BiOp failed to consider the displacement of winter steelhead into lower quality habitat by hatchery steelhead, *id.* at 51; (4) the BiOp failed to consider climate change effects on top of adverse summer steelhead and other effects, *id.* at 53; (5) the BiOp failed to consider whether the rate of gene flow from summer steelhead to winter steelhead "is or can be accurately calculated to be under 2%[,]" *id.* at 64, and, given that uncertainty and NMFS's statement that "*any* interbreeding" would harm the winter steelhead, whether a 2% gene flow cap could reasonably be pegged to a no jeopardy determination, *id.* at 57, 63 (quoting NOAA AR 2099) (2019 BiOp) (emphasis in Opinion).

[2] The term "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

The Court determined that because the BiOp approved an HGMP that contains winter steelhead protective measures, vacatur might disrupt the listed species should those measures be removed. *Id.* at 77–78. For that reason, the Court remanded the case without vacatur to NMFS to prepare a new BiOp that complies with the ESA. *Id.* at 79. The Court directed the parties to provide further briefing as to remedy. The parties underwent settlement talks with Magistrate Judge Mark D. Clarke but could not reach agreement. Plaintiffs now seek interim injunctive relief pending the issue of a lawful BiOp. Pl. Mot. at 1. Plaintiffs also request that the Court retain jurisdiction over this case. Pl. Reply at 12, ECF No. 107.

## LEGAL STANDARD

Generally, a plaintiff seeking a permanent injunction must show: (1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. *Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1088 (9th Cir. 2015). However, in ESA cases, "the ESA removes the latter three factors in the four-factor injunctive relief test from [a court's] equitable discretion." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 817 (9th Cir. 2018). "When considering an injunction under the ESA, [a court] presume[s] that remedies at law are inadequate, that the balance of interests weighs in favor of protecting endangered species, and that the public interest would not be disserved by an injunction." *Id.*

However, "there is no presumption of irreparable injury where there has been a procedural violation in ESA cases." *Cottonwood Env't Law Ctr.*, 789 F.3d at 1091.

Where plaintiffs seek interim injunctive relief for such violations, "the first prong of the injunction test should be modified to match the analogous prong in the preliminary injunction test: plaintiffs must show that they are "likely to suffer irreparable harm in the absence of [injunctive] relief." *Nat'l Wildlife Fed'n*, 886 F.3d at 817. "A possibility of irreparable harm cannot support an injunction." *Id.* at 818 (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). But "[i]n light of the stated purposes of the ESA in conserving endangered and threatened species and the ecosystems that support them, establishing irreparable injury should not be an onerous task for plaintiffs." *Cottonwood Env't Law Ctr.*, 789 F.3d at 1091.

**DISCUSSION**

Plaintiffs seek to enjoin further releases of summer steelhead into the North Santian River in the period before NMFS issues a revised BiOp. Pl. Mot. at 1. Plaintiffs contend that they will suffer irreparable harm absent such relief. *Id.* at 7.

It is well established that a court can provide interim equitable relief for procedural ESA violations during the pendency of a remanded BiOp where plaintiffs make the requisite irreparable harm showing. In *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 796 (9th Cir. 2005), the Ninth Circuit held that a district court's rejection of a biological opinion under the ESA, together with its finding of irreparable harm, were "precisely the circumstances in which our precedent indicates that the issuance of an injunction is appropriate." "Given a substantial

procedural violation of the ESA in connection with a federal project, the remedy must be an injunction pending compliance with the ESA." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 839 F. Supp. 2d 1117, 1131 (D. Or. 2011) (citing *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985)). "[T]he strict substantive provisions of the ESA justify more stringent enforcement of its procedural requirements, because the procedural requirements are designed to ensure compliance with the substantive provisions." *Thomas*, 753 F.2d at 764.

I. *Irreparable Harm*

A. *Winter Steelhead Status*

Plaintiffs show that the winter steelhead is in low abundance, is precipitously declining despite hatchery program reforms, and is at a fraction of its recovery target.

ODFW counts total winter steelhead returning from the ocean to the UWR at the Willamette Falls counting station. NOAA AR 14392 (2019 FEIS) (explaining that a counting station at Willamette Falls "provide[s] a complete count of fish returning to the DPS"). But only about two-thirds of the winter steelhead counted at the Falls are estimated to be the native *late* winter steelhead, which is the ESA-listed threatened steelhead. First McMillan Decl. ¶¶ 41–42, ECF No. 97; *id.*, Ex. 29 (1971–2024 Willamette Falls Fish Counts), ECF No. 97-27. The other populations in the total winter steelhead count are non-native *early* winter steelhead—remnants of ODFW's prior discontinued non-native winter steelhead hatchery program—and summer-winter steelhead hybrids. *Id.* In discussing winter steelhead abundance, NMFS and ODFW cite the Willamette Falls *total* winter steelhead counts. Even though the total winter steelhead counts inflate the native winter steelhead numbers,

the total counts help to show trends in native winter steelhead abundance. For example, during the period 1985 through 2016, total winter steelhead returns to Willamette Falls averaged 4,707, peaking one year at 13,452 fish. NOAA AR 2031 (2019 BiOp). For the ten-year period from 2007 to 2016, an average of 3,014 winter steelhead returned annually to the Falls. *Id.*

In 2017, total winter steelhead counted at the Falls hit a record low abundance of 822, in part due to pinniped predation at the Falls. First McMillan Decl. ¶ 40, Ex. 28 at 183–84, NOAA, Biological Viability Assessment Update for Pacific Salmon and Steelhead Listed Under the Endangered Species Act: Pacific Northwest (Jan. 2022), ("NOAA 2022 Viability Assessment"), ECF No. 97-26.[3] After ODFW implemented pinniped controls, total winter steelhead counts rebounded somewhat, but NMFS cautioned that "high" returns in 2019 and 2020 were equivalent to past lows. *Id.* at 189. For the five-year period, 2020–2024, the average total winter steelhead count was 4,265. First McMillan Decl. ¶ 42, Ex. 29 (1971–2024 Willamette Falls fish counts).

In its 2015 Status Review, NMFS noted that none of the four listed UWR winter steelhead populations is meeting recovery targets, that all four have downward abundance trends, and that "there is some concern that the summer-run steelhead releases . . . may be influencing the viability of native steelhead in the

[3] Ex. 28, Nat'l Oceanic & Atmospheric Admin., *Biological Viability Assessment Update for Pacific Salmon and Steelhead Listed Under the Endangered Species Act: Pacific Northwest* (MJ Ford, ed.) (Jan. 2022), https://www.fisheries.noaa.gov/west-coast/endangered-species-conservation/biological-viability-assessment-update-pacific-salmon-and-steelhead-listed-under, ECF No. 97.

North and South Santiam rivers." NOAA AR 13927 (2015 Status Review); *see also* NOAA AR 2036 (2019 BiOp) (stating the same). In 2015, NMFS determined that though "the inability to discriminate between early- and late-winter steelhead . . . limits the precision of any estimates . . . overall abundance for the Upper Willamette River winter steelhead DPS remains low with recent trends being stable." NOAA AR 13918 (2015 Status Review).

However, in its 2024 Five-Year Status Review, NMFS determined that UWR steelhead are at "moderate-to-high risk [of extinction], with a declining viability trend." First McMillan Decl. ¶ 40, Ex. 27 at 19, NOAA, 2024 5-Year Review: Summary & Evaluation of Upper Willamette River Steelhead (July 8, 2024), ECF No. 99, ("NOAA 2024 5-Year Status Review").[4] Thus, based on data collected after this case was filed, NMFS changed its assessment of UWR winter steelhead abundance from "remains low" with recent "stable" trend to "moderate-to-high risk [of extinction], with a declining viability trend."

Plaintiffs' expert estimates, based on the total winter steelhead count in 2025, that "UWR steelhead are at 26% of their recovery target, which is likely an overestimate[]" because about 1/3 of the total winter steelhead in that count are non-native winter steelhead. First McMillan Decl. ¶ 43, Ex. 30, 2025 Willamette Falls Fish Count, ECF No. 97-28.

[4] Ex. 27, Nat'l Oceanic & Atmospheric Admin., *2024 5-Year Review: Summary & Evaluation of Upper Willamette River Steelhead, Upper Willamette River Chinook Salmon* (July 8, 2024), https://www.fisheries.noaa.gov/resource/document/2024-5-year-review-summary-evaluation-upper-willamette-river-steelhead-upper, ECF No. 99, ("NOAA 2024 5-Year Status Review").

Plaintiffs' expert states that to his knowledge, "there is no official published estimate of recent North Santiam winter steelhead abundance." McMillan Decl. ¶ 44. However, according to NMFS, fish counts at the North Santiam Bennet Dams, which are downstream of the Minto Fish Facility, are "the best measure of steelhead abundance" on the North Santiam River. NOAA AR 13919 (2015 Status Review). Of note, ODFW stopped counting fish at Bennet Dams after 2024. First McMillan Decl. ¶ 44, Ex. 31 (ODFW Bennet Dam Fish Counts), ECF No. 97-29.

From 2010–2014, the average total winter steelhead counted at the North Santiam Bennet Dams was 1195 ± 194. NOAA AR 13919 (2015 Status Review). The most recent five-year average (2020–2024) count at Bennett Dams is 722 winter steelhead, which is 9% of the recovery target for North Santiam winter steelhead. First McMillan Decl. ¶ 44, Ex. 31 (ODFW Bennet Dam Fish Counts). Plaintiffs' expert provides a higher winter steelhead estimate for the North Santiam River, which he bases on the average (2020–2024) Willamette Falls winter steelhead count. *Id.* ¶ 45 (citing several studies). The Willamette Falls counts include winter steelhead that spawn below Bennet Dams and would not have been counted at Bennet Dams. *Id.* Plaintiffs' expert estimates that the North Santiam population ranges from 864 to 1,752 fish, which is 10% to 21% of the population's recovery target. *Id.* Plaintiffs' expert notes that the South Santiam population "is also far from meeting its recovery target[.]" *Id.* ¶ 46. Using the same method he used to estimate the North Santiam population, he estimates the South Santiam population at 982–1,100 fish, or 25%–27% of the population's recovery target. *Id.*

Defendants do not rebut that the winter steelhead is declining in abundance, that the UWR winter steelhead populations are at an estimated 26% or less of their recovery target, that the North Santiam winter steelhead count ranges from 864 to 1,752 fish (an estimated 9% to 21% of the population's recovery target) or that the South Santiam winter steelhead count is 982–1,100 fish (an estimated 25%–27% of the population's recovery target).

B. *Residual Hatchery Steelhead in the North Santiam River*

Plaintiffs show irreparable harm to the winter steelhead from residual hatchery steelhead, that is, hatchery fish that do not migrate to the ocean but remain in the rivers near their release points. Plaintiffs contend that the residual hatchery fish harm winter steelhead by "competing with winter steelhead for food and space [and] displacing winter steelhead from their rearing habitat." Pl. Mot. at 12.

In the North Santiam River, ODFW releases summer steelhead from the Minto Fish Facility just downstream of the Big Cliff dam. NOAA AR 2007 (2019 BiOp) (map) and 2008 (same); USACE AR 6626. Some proportion of the summer steelhead residualize to the area where they were released, that is, they do not migrate to the ocean and instead stay in freshwater all their lives. NOAA AR 14475 (2019 FEIS). Plaintiffs contend that the residual steelhead are present in the same habitat downstream of the fish facilities in both the North and South Santiam Rivers at the same time as winter steelhead fry and juveniles.[5] NMFS concedes that

[5] One of the mitigation measures imposed by the HGMP and approved by NMFS is to train the hatchery fish to spawn earlier in December and January "to further separate the spawn timing of summer steelhead from winter steelhead[,]"

"[r]esidualization of hatchery steelhead . . . can increase the amount of interaction between naturally produced rearing fish and hatchery summer steelhead[,]" increasing the potential for "negative effects" to the winter steelhead. NOAA AR 14475 (2019 FEIS).

Plaintiffs show that the residual summer steelhead and the winter steelhead overlap in space. Winter steelhead spawn near Minto Fish Facility, NOAA AR 2109 (2019 BiOp), which is where ODFW releases summer steelhead into the North Santiam River, USACE AR 6626; *see also* NOAA AR 14476 (2019 FEIS) (explaining that when steelhead return from the ocean to spawn in freshwater, they return to areas just below the dams and near fish facilities because they seek to reach the "highest quality rearing habitat"). The offspring of winter steelhead that spawn in that area likely rear in that area, because "[w]ild steelhead do not move far from their redds [gravel nests] early in life, and they often remain within a kilometer during most of their freshwater residence." First McMillan Decl. ¶ 24, Ex. 20 at 5–8 (Hume & Parkinson 1987), ECF No. 97-19; Ex. 21 at 23 (Chambers 2025), ECF No. 97-20.

As to the hatchery fish, ODFW releases summer steelhead yearlings into the same areas of the North and South Santiam Rivers in which winter steelhead spawn

---

which spawn in March through June. NOAA AR 2141, 2031 (2019 BiOp); *see also* NOAA AR 2130 (same) (Figure 44, showing conceptual diagram of potential overlap in summer and winter steelhead program spawn timing). So, when the hatchery summer steelhead return to spawn, the theory is that they will return at their trained spawning time and will not be present at the same time that winter steelhead return to spawn. Regardless of the separation of spawn timing, Plaintiffs show that the longer-term presence of residual hatchery steelhead in the areas close to the fish facilities in the Santiam Rivers causes a time/space overlap between the two different run types.

and rear. NOAA AR 2138 (2019 BiOp). The "greatest ecological interactions" between newly released hatchery summer steelhead and emergent winter steelhead in the North Santiam River are immediately downstream of the Minto Fish release facility. NOAA 2179 (same). However, unlike most hatchery steelhead that migrate to the ocean, residual hatchery steelhead "remain close to their release sites" for "several months to years." First McMillan Decl. ¶¶ 24, 25, Ex. 20 at 5–8; Ex. 7 (McMichael et al. 2000), ECF No. 97-7; Ex. 22 (Tatara et al. 2019), ECF No. 97-21; *see also* NOAA AR 2152 (2019 BiOp) (noting that hatchery steelhead residualize "below the hatchery facilities in the North and South Santiam rivers"). In the North Santiam River, residual summer steelhead thus likely occur near and immediately downstream of the Minto Fish Facility—in the winter steelhead spawning and rearing habitat.

Plaintiffs show that the residual summer steelhead and the winter steelhead overlap in time. Winter steelhead "spawn in March through June, with peak spawning in late April and early May." NOAA AR 2031 (2019 BiOp). From April through July, winter steelhead eggs develop in redds near the Minto Fish Facility. NOAA AR 4258 (2018 HGMP) (time of development). After emerging from their redds, juvenile winter steelhead rear in the river for one to four years, before migrating to the ocean. NOAA AR 2031 (2019 BiOp). However, some juveniles rear in freshwater for up to seven years. NOAA AR SUP 1033 (2000 BiOp).

As to the hatchery fish, ODFW releases summer steelhead into the North Santiam River between April 1 and May 30. USACE AR 6648, 6589. When released,

summer steelhead "yearlings" are already about one year old. While most of the yearlings leave within days to weeks of their release, residual summer steelhead "stay in freshwater for months to years before migrating to the ocean or dying in freshwater." Ex. 7 at 4 (McMichael at al. 2020); *see also* NOAA AR SUP 1569 (Harnish et al. 2015) ("Snorkeling revealed considerable overlap of habitat use (in space and time) by residual hatchery steelhead and naturally produced [winter steelhead] in the South Santiam River."). Plaintiffs contend that "some winter steelhead overlap with multiple releases of residual summer steelhead while others experience at least one release of residual summer steelhead." McMillan Decl. ¶ 25.

The parties do not dispute that the hatchery steelhead residualize. They dispute the rate at which they residualize. Plaintiffs estimate that 12.8% of summer steelhead residualize to the North Santiam River annually. The 12.8% rate is based on a 2015 South Santiam River study of summer steelhead residualization. NOAA AR SUP 1569 (Harnish et al. 2015); First McMillan Decl. ¶ 11 ("To my knowledge, Harnish et al. (2015) is [the] only publication that provides a specific residualization rate for the South Santiam summer steelhead population."). Plaintiffs' expert notes that there are no residualization studies of hatchery fish in the North Santiam River, *id.* ¶ 18, and that the 12.8% residualization rate is consistent with such rates found in other hatchery steelhead populations, *id.* ¶¶ 13, 14.[6] Plaintiffs apply the 12.8%

[6] Plaintiffs' expert explains that residualism is the result of certain rearing conditions and that North Santiam River hatchery steelhead are reared differently than South Santiam River hatchery steelhead. *Id.* ¶ 18. For that reason, the residualization rate for the North Santiam River may be *higher* or lower than that for the South Santiam River. *Id.* (emphasis in original).

residualization rate to the 2020–2024 average annual hatchery steelhead release into the North Santiam of 101,631 to estimate that 13,009 hatchery steelhead residualize to the North Santiam River annually. *Id.* ¶ 19.

ODFW contends that the 12.8% rate is too high and is inflated by a fish-tagging bias, that is that the tagged fish used in the study residualize at higher rates than untagged fish. ODFW Resp. at 6, ECF No. 103; Kelley Decl. ¶ 6–13, ECF No. 104. Notably, ODFW supplies no actual residualism data for the North or South Santiam Rivers.[7] However, after reviewing the parties' arguments as to a possible tagging bias, the Court is persuaded that 12.8% is a reasonable estimate for the summer steelhead residualization rate for the South Santiam River and is reasonably applied to the North Santiam River, given the absence of data for that river.

In its Response, NMFS does not rebut the 12.8% residualization rate, and it does not rebut Plaintiffs' contention that residual summer steelhead resulting from further hatchery releases are likely to irreparably harm winter steelhead. *See, generally*, NMFS Resp., ECF No. 101. However, in 2019, NMFS stated that "for most steelhead hatchery programs, the estimated residualism rate is less than 10 percent." NOAA AR 14475 (2019 FEIS) (citing studies). In its Response, ODFW contends that the residualization rate is 5.6%.[8] ODFW Cross-Mot. at 17, ECF No. 59. The Court

---

[7] The HGMP approved by NMFS sets a target residualization rate of less than 10%. NOAA AR 4246 (2018 HGMP). Plaintiffs point out that ODFW should have residualism data to show that it is complying with that target.

[8] ODFW's preferred rate came from a 2012 meta-analysis of steelhead programs throughout the Pacific Northwest, which found an average residualization rate of 5.6%, ranging from 0 to 17%. NOAA AR 2152 (Hausch & Melnychuk 2012).

notes that despite ODFW's estimate, NMFS, the consulting ESA expert, approved the HGMP with a residualism target of "less than 10%," not 5.6%.

Using 9.9% for the NMFS "less than 10%" rate, Plaintiffs' expert calculates that 10,061 residual summer steelhead are released annually into the North Santiam. First McMillan Decl. ¶ 20. The ODFW 5.6% rate results in 5,691 residual summer steelhead released in the North Santiam annually. *Id.* ¶ 21. Thus, whether the annual number of residual summer steelhead released into the North Santiam is 13,009 by Plaintiffs' estimate, 10,061 by NMFS's estimate, or 5,691 by ODFW's estimate, thousands of residual summer steelhead are introduced into the North Santiam River annually. And those fish remain for months to years in the winter steelhead spawning and rearing grounds.

C. *Competition & Displacement*

Plaintiffs show that residual hatchery steelhead in the North Santiam are likely to irreparably harm winter steelhead by outcompeting the winter steelhead for limited resources and by displacing the winter steelhead from its rearing grounds to lower quality habitat.

1. *Competition*

Plaintiffs show that residual summer steelhead likely outcompete winter steelhead for limited resources. According to Plaintiffs' expert, the best available science shows that "[w]ild steelhead productivity decreases when hatchery steelhead

---

ODFW has not supplied the Court with a copy of the 2012 Hausch & Melnychuk study, so the Court cannot properly review it.

are present." First McMillan Decl. ¶¶ 8, 36 (citing Exs. 4, 5, 6, 7 (studies)). The likelihood of harm to the winter steelhead is directly related to hatchery fish abundance, length of presence of hatchery fish in the habitat, and hatchery fish size. *Id.*; *see also* NOAA AR 2089 (2019 BiOp) ("Naturally produced fish may be competitively displaced by hatchery fish early in life, especially when hatchery fish are more numerous, are of equal or greater size, when hatchery fish take up residency before naturally produced fry emerge from redds [nests], and if hatchery fish residualize."); NOAA AR 14475 (2019 FEIS) ("Residualization of hatchery steelhead . . . can increase the amount of interaction between naturally produced rearing fish and hatchery summer steelhead[]" including "potential negative effects through competition and predation[,]" which "would increase.").

A 2015 study of residual steelhead in the South Santiam River found that (1) residual steelhead occur in winter steelhead habitat; (2) summer steelhead, released as yearlings "are larger than [winter steelhead] in rearing areas where the two groups overlap[;]" (3) residual summer steelhead dominate interactions with smaller winter steelhead (showing evidence of competition); and (4) more residual summer steelhead occur in better habitat and more winter steelhead occur in worse habitat (showing evidence of likely displacement). NOAA AR SUP 1604–05, 1600 (Harnish et al. 2015)). The investigators found that residual summer steelhead in the South Santiam River "typically initiated and dominated the interaction" with winter steelhead and that 84% of interactions resulted in the domination and displacement of the winter steelhead. *Id.* at 1600.

Plaintiffs contend that residual summer steelhead likely harm winter steelhead because they remain in the river for months to years, are present in large numbers (an estimated 5,691–13,009 annually), are larger in size,[9] and display aggression or dominating behavior toward winter steelhead. First McMillan Decl. *Id.* ¶¶ 8, 9, 28–30 (citing Exs. 9, 10 (studies) and NOAA AR SUP 1604 (Harnish et al. 2015)). Plaintiffs' expert opines that "residual summer steelhead are likely outcompeting smaller winter steelhead." *Id.* ¶ 30. The consequence is great because "late spring and early summer is a critical period for juvenile [winter] steelhead growth and survival." *Id.* ¶ 27 (citing studies).

2. *Displacement*

Plaintiffs also show that residual steelhead likely displace winter steelhead into lower quality rearing habitat. Harnish et al.'s 2015 South Santiam study found that the concentration of residual hatchery steelhead was highest closest to the hatchery and decreased with distance from the hatchery. They also found that the concentration of winter steelhead was low close to the hatchery and increased at increasing distance from the hatchery. NOAA AR SUP 1560, 1569 (Harnish et al. 2015). Plaintiffs' expert opines that, based on the Harnish et al. (2015) data, residual summer steelhead are likely displacing winter steelhead into lower quality habitat in

[9] Based on ODFW data, Plaintiffs' expert estimates that residual summer steelhead in the North Santiam River have an average length of 180 mm. First McMillan Decl. ¶¶ 29, 30. Harnish et al. (2015) found that residual summer steelhead in the South Santiam River measured 150–300 mm and that winter steelhead in the South Santiam River measured 100–200 mm. *Id.*; NOAA AR SUP 1604 (Harnish et al. 2015).

the South Santiam River and that the same displacement is likely happening in the North Santiam River. First McMillan Decl. ¶¶ 31–34.

Plaintiffs contend that the consequences of competition and displacement to the winter steelhead are reduced growth, decreased reproductive productivity, reduced survival, and declining abundance. Pl. Mot. at 8; First McMillan Decl. ¶¶ 36–39. Plaintiffs' expert cites several studies, including a 2006 study of a Clackamas River hatchery steelhead program, Ex. 4 (Kostow and Zhou 2006), ECF No. 97-4, that show that "large releases of hatchery steelhead correlate with decreased productivity in wild populations." *Id.* ¶¶ 36–39 (citing and explaining studies). "[W]ild salmonid productivity may decrease soon after a hatchery program begins . . . and remain at depressed levels throughout the program's lifetime." *Id.* ¶ 38. Plaintiffs' expert opines that, based on the best available science, "summer steelhead competition with, and displacement of, winter steelhead likely causes significant harm to UWR [winter] steelhead, including but not limited to stalling the recovery of the species." *Id.* ¶ 39.

ODFW disputes that residual hatchery fish are outcompeting and displacing winter steelhead. ODFW Resp. at 11–12. ODFW contends that their analyses "show that the average effects of competition and displacement by hatchery summer steelhead on winter steelhead are near zero" and that the risk of extinction to the UWR winter steelhead over the next 100 years is "low." *Id.*; Sabal Decl. ¶¶ 15, 25, ECF No. 105.

ODFW bases its assertions on two recent analyses that it conducted: (1) a "Stock Recruitment Analysis" ("SRA"), "a statistical model that examined whether

the number of hatchery summer steelhead released . . . correlated with fluctuations in winter steelhead adult returns occurring since 1990[,]" Sabal Decl. ¶ 15; and (2) a "Population Viability Analysis" ("PVA"), a statistical model to predict, based on population dynamics, the extinction risk to UWR wild winter steelhead in 100 years, *id.* ¶ 25.

Plaintiffs' expert maintains that both analyses are unreliable because they are fatally flawed. *See* Second McMillan Decl. ¶¶ 11–24, ECF No. 108. The Court need not recount all the details of ODFW's analyses and Plaintiffs' critiques. Most notably, ODFW's SRA, which found "near zero" competition and displacement effects, is flawed because, among other things, it fails to compare pre-hatchery winter steelhead productivity with current winter steelhead productivity. *Id.* ¶¶ 21, 22; Pl. Reply at 8. Because "wild salmonid productivity may decrease soon after a hatchery program begins . . . and remain at depressed levels throughout the program's lifetime[,] . . . modeling that does not include all pre-hatchery release data" will not show the effect. First McMillan Decl. ¶ 38. ODFW began releasing summer steelhead in 1966. But ODFW's analysis excludes available pre-hatchery winter steelhead productivity data (from 1967–1990) and instead relies on post-1990 data and data from a non-release year as a proxy for pre-hatchery productivity data to conclude that Santiam winter steelhead productivity did not decline following the onset of the hatchery program. Second McMillan Decl. ¶¶ 21, 22; Pl. Reply at 8; Sabal Decl. ¶¶ 23, 24. Further, the SRA uses a 10% decline in recruits as the benchmark for finding a "substantially negative" effect of the hatchery program on the Santiam winter steelhead. Sabal

Decl. ¶ 20. But, as Plaintiffs point out, the Santiam winter steelhead populations are already depressed (at a fraction of their recovery targets). Pl. Reply at 7; Second McMillan Decl. ¶ 23. The North Santiam population is at an estimated 9% to 21% of its recovery target. "Any declines in depressed populations are significant because recovery requires more recruits." Second McMillan Decl. ¶ 23. Contrary to ODFW's analysis, the evidence shows that anything less than what is needed for recovery would irreparably harm the Santiam winter steelhead populations, especially given climate-change-caused warming water trends that will render "the majority of currently accessible habitat . . . unsuitably warm within the next 50 years."[10] For the species to survive, the number of recruits must increase. A recruit decline of 10% is an unreasonable benchmark for determining harm to the species.

The Court concludes that ODFW's omission of pre-hatchery productivity data from its analysis and its unreasonable benchmark for determining harm to the Santiam winter steelhead, among other flaws, render the analysis unreliable. *See, e.g.*, Second McMillan Decl. ¶¶ 14–24 (describing SRA flaws); Pl. Reply at 7–8 (describing SRA's "seven major flaws").

---

[10] Climate change effects are especially important to a species such as the winter steelhead that is acutely sensitive to warming water temperatures. In its most recent five-year status review, NMFS notes that "[n]ew climate change modeling of projected water temperatures in the Willamette Basin (Oregon State 2022) estimate[s] that the majority of currently accessible habitat [for the North and South Santiam winter steelhead populations] will become unsuitably warm within the next 50 years." Ex. 27 at 28 (NOAA 2024 5-Year Status Review); *see also* McMillan Decl. ¶ 47, Ex. 32 at 6 (Wade et al. 2013), ECF No. 97-30; Second McMillan Decl. ¶ 11; Ex. 41 at 17 (Crozier et al. 2019), ECF No. 108-1.

The PVA model, which concludes that the extinction risk to winter steelhead in the North and South Santiam Rivers over the next 100 years is "low," is flawed most notably because (1) the model does not account for climate change or human population growth in the UWR over the next 100 years, Pl. Reply at 9; Second McMillan Decl. ¶ 11; and (2) the model masks the extinction risk to native steelhead "by lumping native and non-native winter steelhead counts together[,]" Second McMillan Decl. ¶ 12. The Court concludes that the omission of key variables from the PVA model—especially climate change, which is predicted to further harm the species' habitat—renders the results of that model unreliable.

Accordingly, ODFW fails to rebut Plaintiffs' evidence that the further release of hatchery steelhead into the North Santiam will likely cause irreparable harm to the North Santiam winter steelhead population by outcompeting and displacing them to lower quality rearing habitat.

D. *Genetic Introgression*

Plaintiffs show irreparable harm from genetic introgression, that is, from the flow of genetic material from hatchery fish to native fish that results from interbreeding.

In its 2008 BiOp, NMFS concluded that the release of summer steelhead into the North and South Santiam Rivers jeopardizes the continued existence of the Santiam winter steelhead populations. NOAA AR 2238–3508 (2008 BiOp). The BiOp lists "genetic introgression" as a key factor limiting wild steelhead recovery. NOAA AR 2419 (2008 BiOp), 2626 (South Santiam), 2674 (North Santiam), 2890 (explaining

that gene flow into a native fish population from "naturally spawning hatchery fish" has been found to reduce the genetic diversity, fitness, and long-term reproductive success of the native winter steelhead populations); *see also* NOAA AR 7605 (Sharpe et al. 2017) (explaining that, in addition to lack of access to historical habitat and degradation of remaining habitat below the dams, UWR winter steelhead recovery is limited by "the potential for competition, predation and genetic introgression from out-of-ESU hatchery fish interacting with and spawning in the wild with the native winter-run").

In its 2019 BiOp, NMFS stated that "*any* interbreeding" between hatchery steelhead and winter steelhead "would result in a negative effect on winter steelhead productivity and diversity." NOAA AR 2099 (2019 BiOp) (emphasis added). Yet it also determined that jeopardy to winter steelhead could be avoided by keeping the gene flow rate under 2%. NOAA AR 2009–10 (same).

In their summary judgment motions, the parties disputed the reliability of different models used to estimate gene flow rate. Op. at 59. Deferring to agency expertise, the Court determined, in the abstract, that either the Scott-Gill or Island Continent model "would constitute the best scientific and commercial data and that the agency's use of the data in either is supportable." Op. at 59. However, the Court noted that any gene flow determination, regardless of the model, must be "supported by reasoned analysis." Op. at 61 (quoting *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 621 (9th Cir. 2014)). That is, given the best scientific data and the facts of the case, the gene flow estimate must make sense. The Court determined

that Defendants' gene flow estimates did not make sense: "What the Court does find is that there is a high level of uncertainty about what the current gene flow rate *is*, and that the data, on the whole, does not support the BiOp's approval of the HGMP" and the no jeopardy determination. Op. at 63 (emphasis in original); *see also id.* at 64 ("[I]t is entirely unclear whether the 2% gene flow cap is or can be attained or measured, especially in light of uncertainty regarding the variability or accuracy of the measures used to calculate gene flow."). Finally, the Court noted that NMFS failed to supply a reasoned basis for pegging it's no jeopardy determination to a 2% gene flow rate in light of the uncertainty in calculating that rate and NMFS's contradictory view that "*any* interbreeding . . . would have a negative effect on the species." *Id.* at 63 (quoting NOAA AR 2099 (same) (emphasis in Opinion)).

Plaintiffs agree with NMFS that any interbreeding between the two run types would harm the Santiam winter steelhead populations and would do so for four reasons: (1) only 8% of winter steelhead in the North Santiam River and about 50% of winter steelhead in the South Santiam River are pure native winter steelhead; (2) hatchery genes persist in the winter steelhead populations and decrease the reproductive fitness of offspring for generations; (3) the populations are already depressed and are precipitously declining; and (4) the populations cannot sustain even low levels of gene flow from hatchery fish on top of climate change and other adverse impacts such as competition and displacement by residual summer steelhead. Pl. Mot. at 17–18; First McMillan Decl. ¶¶ 49–51. Plaintiffs' expert opines that "no amount of interbreeding between winter and summer steelhead is safe" given

the "highly depressed status" of the Santiam Basin populations (with the North Santiam DPS at an estimated 9% to 21% of its recovery target) and "the low numbers of pure, native winter steelhead." First McMillan Decl. ¶¶ 49, 56.

Based on a recent sampling of winter steelhead in the UWR, Plaintiffs contend that only 8% of winter steelhead in the North Santiam River are pure native winter steelhead. Pl. Mot. at 5; Ex. 33 at 8 (Johnson et al. 2021),[11] ECF No. 97-31. That is, only 8% of North Santiam winter steelhead carry the population's genetic legacy. So, any interbreeding with summer steelhead "carries especially high risks" of extinction to the Santiam populations—especially to the North Santiam population. *Id*. at 17; *see also* Pl. Reply at 9 (explaining that the "proverbial genetic foundations" of the North Santiam population are "crumbling.").

Plaintiffs contend that the harm from interbreeding with hatchery fish adversely affects multiple generations. *Id.* at 18. First, hatchery genes persist in the winter steelhead populations. First McMillan Decl. ¶ 50; Ex. 33 at 8 (Johnson et al. 2021) (finding that 4% and 12% of North Santiam and South Santiam steelhead below dams are summer steelhead-winter steelhead hybrids, respectively, and "that > 50% of fish sampled below North Santiam River dams assigned to . . . *non-native* winter steelhead"—remnants of ODFW's prior discontinued hatchery program (emphasis added)). Second, Plaintiffs' expert explains that hatchery genes reduce reproductive

[11] Johnson et al. sampled winter steelhead below the dams on the North and South Santiam Rivers and found that only 8% of winter steelhead in the North Santiam River below the dams and 50% of winter steelhead in the South Santiam River below the dams were pure native winter steelhead. Ex. 33 at 8 (Johnson et al. 2021), ECF No. 97-31.

fitness in first generation offspring and because the hatchery genes are passed to the next generation, second generation offspring also suffer reduced reproductive fitness. First McMillan Decl. ¶ 51, Ex. 35 at 3 (Araki et al. 2009), ECF No. 97-33, Ex. 34 at 1 (Harbicht et al. 2014), ECF No. 97-32. Based on studies of hatchery populations, Plaintiffs' expert states that it will take "five to eleven generations" or "25 to 55 years to shed deleterious hatchery genes" from the Santiam populations. *Id.*

Finally, Plaintiffs note that "while the allegedly lower gene flow rates would be an improvement, NMFS did not show that these improved levels are sufficient to protect winter steelhead on top of the effects of climate change." Pl. Mot. at 18.

In its Response, NMFS does not rebut Plaintiffs' contention that any interbreeding will cause irreparable harm to the winter steelhead DPS. Nor does it defend the 2% gene flow cap. ODFW contends that Plaintiffs fail to show irreparable harm because ODFW's 2022 gene flow analysis, using the Island-Continent method, estimates gene flows below 2%: "1.22% in the North Santiam and 0.55% in the South Santiam[.]" ODFW Resp. at 10–11.

Plaintiffs' expert reviewed ODFW's gene flow methodology and notes that, to his knowledge, the analysis and results were not verified by a geneticist; Second McMillan Decl. ¶ 29. He further explains that NMFS did not provide "written concurrence on ODFW's sampling, genetic markers, [or] analytical approaches, as the BiOp requires," *id.* ¶ 28; the genetic sampling was conducted only on a "subset of tributaries" surveyed by Johnson et al. (2021), Ex. 33, rather than all of them, which would provide a more direct comparison to prior results, *id.* ¶ 30; and ODFW

attributed the lower gene flow to the hatchery's "adaptive management" but did not explain whether the below average summer steelhead returns in 2019–2021 could explain the results, *id.* ¶ 31. Plaintiffs also contend that because ODFW's no harm analysis is pegged to a 2% cap, the analysis "does not resolve whether winter steelhead can withstand any current or legacy-related gene flow on top of climate change." Pl. Reply at 10; Second McMillan Decl. ¶ 27.

Plaintiffs also contend that ODFW's gene flow data and analysis are not entitled to deference in the Court's equitable remedy analysis. Pl. Reply at 4. This is so because an agency's experts' reasoned opinions are not entitled to deference outside of administrative action. *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1186 (9th Cir. 2011). In *Sierra Forest Legacy*, the Ninth Circuit explained that the district court "improperly conflated deference in the context of judicial review of an agency decision . . . with deference in consideration of the equities after a violation of law has been found." *Id.* "Deference to agency experts is particularly inappropriate when their conclusions rest on a foundation tainted by procedural error." *Id.* Here, Plaintiffs point out that ODFW is not the ESA expert consulting agency and that ODFW's views rest in part on an invalid BiOp. *Id.* Indeed, in its Opinion, the Court determined that the BiOp was invalid in large part because NMFS failed to consider whether a gene flow rate could be calculated with any certainty, regardless of the model used, and whether, given that uncertainty and NMFS's view that any gene flow would harm the species, a no jeopardy determination could reasonably be pegged to 2% gene flow cap.

The Court has reviewed the parties' arguments and exhibits, and concludes, as did NMFS and Plaintiffs, that *any* further gene flow to the Santiam winter steelhead populations will likely cause irreparable harm to those populations. The Court concludes that the North Santiam population is especially vulnerable to further gene flow because only 8% of the population carries the native gene set and the population is particularly depleted—at a mere 9% to 21% of its recovery target.

E. *Harm to Plaintiffs' Members*

Plaintiffs seeking injunctive relief must show that they themselves are likely to suffer irreparable harm absent an injunction. *Nat'l Wildlife Fed'n*, 886 F.3d at 822; *see also Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (for standing purposes, plaintiff must show "injury to the plaintiff" rather than "injury to the environment").

Here, Plaintiffs have shown irreparable harm to their own interests stemming from the harm to the Santiam winter steelhead populations. For example, Riverkeeper member Christina Eastman fished for winter steelhead in the North Santiam River since before they were ESA-listed in 1999 but will not do so now because the population is ESA-listed and has "declined so much." Eastman Decl. ¶ 4, ECF No. 53. "I do not fish the North Santiam at all now, because I do not want to hook and hurt a winter steelhead." *Id.* Similarly, Conservation Anglers' Scientific Advisor, Bill Bakke, fished for winter steelhead in the Santiam Basin for decades, but he will not do so again until the fish recover. Bakke Decl. ¶¶ 8, 12, ECF No. 51. "The ongoing harm to winter steelhead caused by summer steelhead in the Upper

Willamette River Basin has harmed and continues to harm my personal, professional, and recreational interests in winter steelhead." *Id.* ¶ 12.

II. *ODFW's Status*

Intervenor Defendant ODFW contends that Plaintiffs are not entitled to relief from ODFW because "Plaintiffs' Second Amended Complaint contains no allegations against ODFW, states no claims against ODFW, and seeks no relief from ODFW." ODFW Resp. at 5.

Plaintiffs are entitled to relief from ODFW, including the enjoining of further summer steelhead releases into the North Santiam River. This is so because ODFW intervened in this action and is bound by all future court orders, including injunctions. *U.S. v. Or.*, 657 F.2d 1009, 1014 (9th Cir. 1981) ("Intervenors under Fed. R. Civ. P. 24(a)(2) . . . enter the suit with the status of original parties and are fully bound by all future court orders."); *Cal. Chamber of Commerce v. Council for Educ. Rsch. On Toxics*, 29 F.4th 468, 483 (9th Cir. 2022) ("This includes the duty to be bound by the district court's injunction order."); *Schneider v. Dumbarton, Inc.*, 762 F.2d 129, 132 (D.C. Cir. 1985) (explaining that the "price of . . . intervention . . . is the possibility that the plaintiff will be able to obtain relief against the intervenor-defendant even if the original defendant is eliminated from the lawsuit").

III. *Scope of Relief*

Defendants contest the scope and propriety of enjoining the further release of summer steelhead into the North Santiam River. NMFS contends that (1) the only "legally appropriate form of relief" is either remand with or without vacatur; (2) the

requested relief is "is not tailored to the APA violations the Court identified;" and that (3) injunctive relief is not necessary to redress Plaintiffs' alleged harms. NMFS Resp. at 6. ODFW similarly maintains that "Plaintiffs' requested relief is not narrowly tailored to the harm alleged." ODFW Resp. at 2.

Defendants contend that the requested relief is overly broad. An injunction for interim relief is not "overly broad" where (1) there is a "sufficient causal connection between the alleged irreparable harm and the activity to be enjoined" and (2) the injunction is "narrowly tailored to avoid the irreparable harm that the district court identified." *Nat'l Wildlife Fed'n*, 886 F.3d at 823 (internal citation and quotation marks omitted). "[B]ut a plaintiff need not further show that the action sought to be enjoined is the exclusive cause of the injury." *Id.*

Here, Plaintiffs have shown the requisite causal connection. Plaintiffs have shown that the further release of summer steelhead into the North Santiam River is likely to cause irreparable harm to the declining North Santiam winter steelhead population. Plaintiffs thus show a connection between the alleged irreparable harm (harm to the winter steelhead from hatchery steelhead releases into the North Santiam River by competition, displacement, and genetic introgression) and the activity to be enjoined (hatchery steelhead releases into the North Santiam River).

The requested relief is narrowly tailored. Plaintiffs have shown irreparable harm from hatchery steelhead releases into both the North and South Santiam Rivers. Plaintiffs could have sought an injunction against releases into both rivers. But they seek to enjoin only the North Santiam releases. Plaintiffs explain that their

"narrow request seeks to protect the [winter steelhead] population with the best chance of survival, allows ODFW to continue operating the South Santiam Hatchery, and would only reduce recreational summer steelhead catch by approximately 7%." Pl. Reply at 12. Plaintiffs' expert explains that "the North Santiam River . . . provides the best habitat to save UWR steelhead." Second McMillan Decl. ¶ 32; *see also* Pl. Mot. at 1 ("Such relief would provide interim protection for winter steelhead in the relatively cleaner river in the Santiam River basin[.]"). Plaintiffs need not show that the North Santiam releases are the exclusive cause of irreparable harm to the UWR or Santiam winter steelhead populations.

The requested relief is narrowly tailored to the ESA violation the Court identified. Plaintiffs bring their ESA claim under the ESA citizen suit provision. 16 U.S.C. § 1540(g). "Because ESA contains no internal standard of review, section 706 of the Administrative Procedure Act, 5 U.S.C. § 706, governs review of the [agency's] actions and the normal 'arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law' standard applies." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011) (cleaned up). However, the APA does not govern the remedy for an ESA violation. "[T]he ESA authorizes 'any person' to bring suit to enjoin any violation of the Act." *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgm*t., 698 F.3d 1101, 1115 (9th Cir. 2012) (citing 16 U.S.C. § 1540(g)(1)(A)). Noncompliance with the ESA's procedural and substantive requirements exposes an action agency to citizen suits. *Id.* "In the context of the ESA, the test for determining if equitable relief is appropriate is whether an

injunction is necessary to effectuate the congressional purpose behind the statute." *Nat'l Wildlife Fed'n*, 422 F.3d at 795. That purpose is to ensure that an agency's actions are "not likely to jeopardize the continued existence of any [listed species] or result in the destruction or adverse modification of habitat of such species[.]" 16 U.S.C. § 1536(a)(2). "If a project is allowed to proceed without substantial compliance with [ESA's] procedural requirements, there can be no assurance that a violation of the ESA's substantive provisions will not result." *Thomas,* 753 F.2d at 764.

Here, the 2019 BiOp determined that releases of hatchery steelhead into the North and South Santiam Rivers would cause "no jeopardy" to the listed winter steelhead populations provided that ODFW complies with the HGMP hatchery reform measures *and* keeps gene flow under 2%. But the Court determined that the "no jeopardy" determination was arbitrary and capricious because the agency failed to consider certain important aspects of the problem. That the BiOp properly considered some, or even most, important aspects of the problem does not rectify an improper "no jeopardy" determination or render an invalid BiOp lawful. Here, the no jeopardy determination was pegged, in large part, to a 2% gene flow cap. The BiOp's failure to account for the uncertainty in calculating the gene flow and the failure to provide a reasoned basis for pegging such an uncertain calculation to the no jeopardy determination, especially in light of NMFS's conflicting view that the species cannot tolerate any gene flow, is a key flaw. An invalid BiOp is an ESA procedural violation. Allowing a project to go forward without substantial compliance with ESA's

procedural requirements risks violating ESA's substantive provisions and further endangering the species. *Thomas*, 753 F.2d at 764.

In sum, Plaintiffs have shown that the further release of hatchery steelhead into the North Santiam River is likely to cause irreparable harm to the declining North Santiam winter steelhead population. Only 8% of the North Santiam winter steelhead are pure native steelhead, and the population has declined to an estimated 9% to 21% of its recovery target. In its most recent status review, NMFS determined that UWR steelhead populations are at "moderate-to-high risk [of extinction], with a declining viability trend." Ex. 27 at 19. Plaintiffs have shown that the North Santiam population needs improved survival now. Improvements that result in immediate increased survival of a listed species are given great weight in a court's equitable analysis. *See, e.g.*, *Cottonwood Env't Law Ctr.*, 789 F.3d at 1090 ("Congress established an unparalleled public interest in the 'incalculable' value of preserving endangered species."). Accordingly, Plaintiffs' Motion for interim injunctive relief is granted.

**CONCLUSION**

For the reasons explained above, Plaintiffs' Motion, ECF No. 96, is GRANTED. ODFW is ORDERED to immediately stop all summer steelhead releases into the North Santiam River. The Court also ORDERS the following:

The parties shall provide joint status reports at regular intervals. The parties shall confer and file with the Court their joint or separate recommendations for a schedule of periodic status reports by October 14, 2026.

The Court maintains jurisdiction over this case to ensure that the injunctive relief is implemented in accord with this Opinion, and to ensure that NMFS issues a revised BiOp to address the defects the Court identified. To challenge a revised BiOp, Plaintiffs must file a new complaint. Plaintiffs may move, under Local Rule 42-3, to provide notice of the related case and to assign the new case in a manner that preserves judicial resources.

It is so ORDERED and DATED this 14th day of September 2026.

/s/Ann Aiken
ANN AIKEN
United States District Judge